Case No. 12-2694

---

In The United States Court of Appeals
For the Seventh Circuit

---

RICHARD FEDDER

Appellant,

vs.

ADDUS HEALTHCARE, INC.; LORIE HUMPHREY; and KIM EVANS;

Defendants-Appellees.

---

On Appeal from the United States District Court for the Southern District of Illinois,
Case No. 08-C-200. The Honorable David R. Herndon, Judge Presiding.

BRIEF OF APPELLANT

Richard Fedder
Attorney
ARDC#6272204
144 Pineview Rd.
Carbondale, IL 62901
Telephone: (618) 201-5834

# DISCLOSURE STATEMENT

Appellate Court No:      12-2694 (on appeal from Case No. 08-200-DRH in the
Southern District of Illinois).

Short Caption:      *Fedder v. Addus Healthcare, Inc.l*

(1) Name of every party that the attorney represents:

Richard Fedder, Edgar Tate (party in the underlying case 08-200-DRH, not a party on appeal)

(2) Names of all law firms whose partners have appeared for the party

Richard Fedder, Attorney-at-Law (solo practice)

(3) For corporate party

    i) Parent Corporation:      Not applicable
    ii) Publicly held Company that holds 10% or more of party's stock:      Not Applicable

Attorney's Signature:      s/Richard Fedder      Date:   9/25/12

Counsel of Record for above listed parties pursuant to Circuit Rule 3(d):      Yes

Address:

    144 Pineview Rd.
    Carbondale, IL.     62901
    Phone: 618-201-5834
    e-mail: rfddr@yahoo.com

# TABLE OF CONTENTS

Cover Page ...................................................................................................... i

Disclosure......................................................................................................ii

Table of Contents ......................................................................................... iii

Table of Authorities ......................................................................................v

I.    Jurisdictional Statement ........................................................................1

II.   Issue Presented for Review ...................................................................2

III.  Statement of the Case ............................................................................3

IV.   Statement of Facts and Procedural History ..........................................6

V.    Summary of the Argument ...................................................................10

VI.   Argument ..............................................................................................11

       A.   Standard of Review  .....................................................................11

       B.   Judge Herndon Did Not Make Findings That Fedder's Conduct Was Dilatory, Multiplicative, Or Undertaken In Bad Faith, As Required By 28 U.S.C. § 1927. ...........15

             (1)   Judge Herndon Failed To Identify A Wrongful *Action* By Fedder Of The Type Proscribed By 42 U.S.C. § 1927...............................................................16

             (2)   Fedder Did Not Conduct This Case In A Manner That Multiplied The Proceedings. ......................................................................................23

             (3)   Judge Herndon Incorrectly Applied An Objective Unreasonableness Standard.   The Correct Standard Is Bad Faith ......................................25

       C.   Fedder Was Denied Notice And A Hearing In Violation Of His Fourteenth Amendment Right To Due Process...................................................................33

       D.   Judge Herndon's Finding That Tate's Claims Against Addus Were Frivolous As A Matter Of Law Ignores The Exception For Good Faith Extensions Of The Law........38

       E.   Judge Herndon's Finding Of Fact That Plaintiff Had No Colorable Basis For Charging Addus With Participating In The Acts Of Discrimination Is Clearly Erroneous.  .............3

VII.  Conclusion.................................................................................................42

Certificate of Compliance .............................................................................43

Certificate of Service ....................................................................................44

Table of Contents of Appendix Included With Brief  ...................................45

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page**

*See Alyeska Pipeline Service Co. v. Wilderness Society* 421 U.S. 240 (1975)............................27

*Boyd v. Illinois State Police,* 384 F.3d 888 (7th Cir. 2004)..................................................17,18,38

*Burda v. M Ecker Co.*, 2 F.3d 769 (7th Cir 1993) ....................................................23,31

*CBOCS West, Inc. v. Humphries* 553 U.S. 442 (2008)............................................................18,38

*Christiansburg Garment Co. v. EEOC,* 434 U.S. 412 (1978) .........................................7,12,33,34

*Dahnke v. Teamsters Local 695,* 906 F.2d 1192 (7th Cir. 1990)..............................................22,31

*Driscoll v. Oppenheimer*, 500 F.Supp. 174 (N.D.Ill.1980) ......................................................29

*FDIC v. Tekfen Constr. & Installation Co.,* 847 F.2d 440 (7th Cir.1988)....................................20

*In re TCI Ltd.*, 769 F.2d 441 (7th Cir. 1985) ................................................................27

*Kapco Mfg. Co., Inc. v. C & O Enters, Inc.*, 886 F.2d 1485 (7th Cir. 1989)............................23,31

*Kotsilieris v. Chalmers,* 966 F.2d 1181 (7th Cir.1992) ................................................................23

*Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223 (7th Cir.1984) ..................................................30

*Maneikis v. Jordan,* 678 F.2d 720 (7th Cir. 1982)......................................................................28

*Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d 928 (7th Cir.1989)....................................12

*McCandless v. Great Atlantic and Pacific Tea Co., Inc.,* 697 F.2d 198 (7th Cir.1983)..... 20,29-30

*Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir. 1986)....................................................................28

*Overnite Transportation Co. v. Chicago Industrial Tire Co.,* 697 F.2d 789 (7th Cir.1983)   15,26,29

*Pacific Dunlop Holdings v. Barosh,* 22 F.3d 113 (7th Cir. 1994). .................................... 11-12,32

*Reid v. United States*, 715 F.2d 1148 (7th Cir. 1983)............................................................20,25,29

*Ross v. City of Waukegan*, 5 F.3d 1084 (7th Cir.1993) ..........................................................23,30

*Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980) ..................................................13,15,27,28

*Samuels v. Wilder*, 906 F.2d 272 (7th Cir.1990) .........................................................31

*Suslick v. Rothschild Sec. Corp.*, 741 F.2d 1000 (7th Cir. 1984) ...................20,26,27,28

**Statutes**                                                                                              **Page**

28 U.S.C. § 1331 ..............................................................................................................1

28 U.S.C. § 1343(a)(3)......................................................................................................1

28 U.S.C. § 1927 ...............................................................................................2,6,8-16,20-38

42 U.S.C. § 1981 ..........................................................................................................1,18,38

42 U.S.C. § 1983.............................................................................................................1,5

42 U.S.C. § 1988......................................2,6,7,8,9,10,12,16,24,27,33,34,35,37,38

42 U.S.C. § 2000e *et. seq.* ..........................................................................................1,18,38

42 U.S.C. 12101 *et. seq.*...............................................................................................1,18

Antitrust Procedural Improvements Act of 1980.........................................................15

U.S. Const., Amendment 1 ..............................................................................................38

U.S. Const., Amendment 14 ..............................................2,11,12,17,33,36,37,38,39,40

**Other Authorities**                                                                                   **Page**

Federal Rule of Appellate Procedure 3……………………………………………………1

Federal Rule of Appellate Procedure 4(a)(1)(A) .............................................................1

Federal Rule of Appellate Procedure 4(a)(6)...................................................................1

Federal Rule of Civil Procedure 11 ....................................................13,20,21,22,31,32,37

H.R. CONF. REP. No. 1234, 96th Cong., 2d Sess. 8 (1980), *reprinted in* 1980 U.S. CODE
CONG. & *ADmN.* NEws, 2716, 2782 ..............................................................25,27,28

Webster's Third New International Dictionary (defining vexatious) .......................26,27

# I.  JURISDICTIONAL STATEMENT

## A.  District Court Jurisdiction

Plaintiff-Appellants' Second Amended Complaint (Doc 63), in case 08-200 DRH in the Southern District of Illinois, sets forth causes of action under 42 U.S.C. § 1981, the Fourteenth Amendment (made actionable by 42 U.S.C. § 1983), Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et. seq.*), and the Americans with Disability Act ("ADA") (42 U.S.C. § 12101 *et. seq.*  The District Court had jurisdiction over this cause pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

## B. Appellate Court Jurisdiction

On September 1, 2011, the Court below issued a Final "Memorandum and Order" in this case, granting summary judgment to all Defendants on all Counts of Plaintiff-Appellant's Second Amended Complaint.  (Doc 114).  The clerk of the Court accordingly entered Final Judgment (Doc 113) on September 7, and then amended Final Judgment (Doc 117) on September 19.

On October 3, 2011, the Addus Group of Defendants filed a Motion for attorney's fees under 42 U.S.C. § 1988.  (Doc 125).  On June 28, 2012, Judge Herndon issued a Final Order on this Motion, ordering attorney Fedder to pay the attorney's fees.

This appeal is taken from the Court's Final Order awarding attorney's fees, pursuant to Rule 3 and Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure.

Plaintiff's Attorney, Mr. Fedder, filed a Notice of Appeal on July 18, 2012, with the Southern District of Illinois Court in Case No. 08-200-DRH.

## II. ISSUES PRESENTED FOR REVIEW

I. Did Judge Herndon act improperly by imposing 28 U.S.C. § 1927 sanctions without addressing any of the *prima facie* elements of that statute for showing that an attorney's conduct multiplied the proceedings both unreasonably and vexatiously?

II. Did Judge Herndon violate attorney Fedder's due process rights under the Fourteenth Amendment by imposing 28 U.S.C. § 1927 sanctions in an amount exceeding $90,000 without first giving Fedder notice and an opportunity to be heard?

III. Did Judge Herndon abuse his discretion by finding that Tate's claims against Addus were not even colorable?

IV. Did Judge Herndon abuse his discretion by invoking 28 U.S.C. § 1927 as a compensatory statute to be used interchangeably with g, when the statute was intended to serve a purpose of deterrence not compensation?

V. Did Judge Herndon abuse his discretion by failing to consider matters of equity, and whether Fedder could possibly afford $92,000 in attorney's fees?

VI. Did Judge Herndon abuse his discretion by waiting nearly ten months after final order in the case to determine for the first time that attorney Fedder's conduct of the case was so outrageous that sanctions should be imposed?

VII. Will this ruling, if allowed to stand, scare attorneys away from representing civil rights plaintiffs and prevent future civil rights attorneys from representing their clients zealously and creatively?

# III. STATEMENT OF THE CASE

This is an appeal of the decision by the District Court to order the Plaintiff's attorney to pay attorney's fees to the Addus Group of Defendants in case 08-200 in the Southern District of Illinois.

The underlying case is a civil rights complaint filed by the Plaintiff Edgar Tate against a number of Defendants, who can be naturally divided into two groups – the Addus Group and the Department of Rehabilitative Services ("DRS") Group.

DRS is an institution of the State of Illinois. Addus is a private corporation with regional headquarters in Marion, Illinois. It contracts with the State of Illinois and DRS to perform two functions – (a) to provide support staff ostensibly to assist DRS personnel, but in many instances to perform the same work as the state personnel; and (b) to provide home health care service workers who can be assigned by DRS counselors to assist their disabled clients in their homes.

The DRS group of Defendants include DRS itself, as well as the following individuals:;

1. Al Farmer – Supervisor of the Anna office of DRS for two years before he retired;

2. Jo Ancell-Gully – Supervisor of the Carbondale office of DRS who then became supervisor of the Anna office of DRS after Farmer retired;

3. Jeff Standerfer – Supervisor/Director of all DRS offices in the southern half of the State during the entire time at issue;

4. Eugene Davis – Special Assistant to Carol Adams, the head of the IDHS at the time of the incidents in question;

The Addus Group of Defendants consists of Addus itself, as well as the following:

1. Kim Evans – director of the Marion regional office of Addus serving Southern Illinois.

2. Linda Humphrey – an agent of Addus who was hired out to the Carbondale office of DRS at the time in question, under Ancell's direction.

At all relevant times, Plaintiff Edgar Tate was the Home Services (HSP) Counselor in the Anna office of DRS.  Al Farmer was the Vocational Rehabilitation (VR) Counselor in the Anna office, when he was promoted to Supervisor of that office in 2003.

Tate alleges that when Farmer became Supervisor, he began making aggressive sexual advances towards Tate's secretary Veronica Green.  When she complained, Tate and the rest of the HSP staff took actions to protect her from Farmer.

In his lawsuit, Tate alleges that he was discriminated/retaliated against because he opposed the repeated sexual advances made by Farmer towards Green.  Tate further alleges that Farmer blamed Green's allegations of sexual harassment on Tate, and attributed those allegations more broadly to an "Hispanic conspiracy" against him, involving Tate and Farmer's Hispanic Supervisor Jerry Jimenez.

According to Tate, Farmer was able to persuade higher officials at DRS that Tate was the source of the problem.  When Farmer retired, Standerfer appointed Ancell to take charge of the Anna office with an express purpose to retaliate/discriminate against Tate.

This appeal involves only the Addus Group of Defendants.  Tate alleges that, when Ancell became Supervisor, she formed an alliance with Evans at Addus.  Tate alleges that Ancell first instructed Addus employee Humphrey, whom she supervised in the Carbondale office, to spy on Tate by computer, and look through his confidential case files to try and find some misconduct to charge him with.  On this basis, Ancell trumped up a phony misconduct charge for nepotism.  Tate was able to use written documentation to disprove it.

Ancell then got Evans to fire both of Tate's top assistants, Case Manager (CM) Robert McCain and Office Support Person (OSP) Mary Sadler, who were Addus employees.

McCain was replaced with Evans' sister, Kohler, who then sought to discredit Tate.

4

Evans and Ancell tried twice to replace Sadler with someone who would spy on Tate. Both of these replacement candidates, first Johnson and then Jordan, provided affidavits that they were asked by Ancell to spy on Tate. Johnson refused to take the job for that reason. Jordan was fired some six months after she took the job because she refused to spy on Tate.

After Jordan was fired, Evans arranged for her daughter, Casey Evans to be hired as OSP.

In addition, Ancell transferred Tate's long-term secretary Green. Tate believes that he was isolated on purpose. From that point on, he became the subject of a series of trumped up and phony disciplinary actions.

Over the course of about a year after McCain was fired by Addus and replaced with Ms. Evans sister, Kohler, Tate was suspended three times. He believed that this was part of a plan to get him fired, using the State's policy of progressive discipline to legitimate the process.

His belief was buttressed by two affidavits – one signed by Humphrey's son, the other by Humphrey's ex-husband. They were both reporting on the same conversation they had with Humphrey. They said that she said not to worry about Tate. "We're going to get him fired" because "he's done some bad things" for which he has "to pay".

After the third suspension, Tate filed this lawsuit.

The Addus Defendants filed a Motion to Dismiss. They argued, among other things that they are private not public so they cannot be charged under 42 U.S.C. § 1983. They further argued that they were not Tate's employer and they did not control his terms and conditions of employment. Doc 7.

Tate responded that he agreed they did not control the terms and conditions of his employment, but that they conspired with Ancell (who did control the terms and conditions of employment) to create a hostile environment against him, to bear false witness against him, and

5

to file phony disciplinary charges for the purpose of getting him fired.  Doc 26.

The Motion to Dismiss was denied in relevant part.

Subsequently, the Addus Group moved for summary judgment, presenting much the same arguments.  However, they added statements from the Deposition of Tate in which he admitted that he had no *personal* knowledge of any conspiracy or plan to get him fired.

 In his response, Plaintiff presented 20 exhibits and nearly 20 witness affidavits to confirm each step in the alleged conspiracy.  He tried to prove each factual allegation, based not on his own personal knowledge, but on the exhibits and knowledge of the witnesses.

However, Judge Herndon granted the Motion for Summary Judgment for both the Addus Group and the DRS Group.

Tate appealed.

Addus, in turn, filed for attorney's fees under 42 U.S.C. 1988, arguing that the claims against Addus were legally frivolous and factually groundless from the start.

Tate responded that they were not frivolous or groundless.

On June 28, 2012, Judge Herndon ruled that the claims against Addus were indeed legally frivolous and factually groundless.  However, he ruled that, instead of having the Plaintiff pay those fees under 42 U.S.C. 1988, as Addus requested, he would order the Plaintiff's attorney to pay under 28 U.S.C. 1927.  The total attorneys' fees for the Addus Group were in excess of $92,000.

Fedder appeals Judge Herndon's ruling.

## IV. STATEMENT OF FACTS AND PROCEDURAL HISTORY

On September 1, 2011, the District Court granted summary judgment to both the DRS Group and Addus Group of Defendants, settling all substantive issues in the case.  Doc 114.

On September 7, Clerk's Judgment was entered on the docket.  The case was closed.  The

clerk wrote that the parties were to pay their own costs.  Doc 115.

On September 19, Judge Herndon ordered that the Clerk's Judgment be amended to remove the order that parties pay their own costs, inviting the Defendants to file for costs.  Doc 116.

On September 26, the Addus Defendants applied for costs, but not for attorney's fees. Doc 118.  On September 27, The DRS group of Defendants did likewise.  Doc 119.  Because such costs are routine, the Plaintiff did not oppose them.

On September 30, Plaintiff filed an appeal of the substantive summary judgment Order. This appeal was given case # 11-3252.  Doc 124.

On October 3, after Plaintiff filed his appeal, and the Appellate Court assumed jurisdiction of the case, the Addus Defendants filed a Motion in the District Court asking that Tate pay the Addus Defendants' attorneys' fees.  They based their Motion solely upon the civil rights fee shifting statute – 42 U.S.C. § 1988.  Docs 125, 126.

Section 1988 enables a a civil rights plaintiff who prevails to obtain attorney's fees from the defendant.  In exceptional circumstances, if the complaint is found to have been completely without merit, *i.e.* legally frivolous and/or factually groundless at the time it was filed (based on an objective standard), the prevailing defendant can obtain compensation in the form of attorney's fees from the plaintiff.  *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 420 (1978).  Bad faith is not required.

The Defendants' Motion for attorney's fees was filed at a time when Fedder was in Baltimore visiting with his Mother who had just been hospitalized because she had a cerebral hemorrhage (essentially a stroke).  Fedder never saw the Addus Defendant's Motion.  Fedder does not dispute that the notice must have been sent by e-mail, but he believes it became buried in lots of other e-mails while he was in Baltimore.  Furthermore, Fedder knew that the case in the Court below was already closed and that the matter of costs was settled as well, so he was not

expecting (nor looking for) any other motion.  Doc 134.

The Addus Defendants requested $92,226.17 in attorney's fees.  Their attorneys affirmed that this was actual total cost for defending the case.  But no itemized hourly billing or detailed accounting was provided.  DocS 125-126, 135.

Because Fedder was not aware of the original request for attorney's fees, he did not file a response at the time.

On February 13, 2012, more than five months after issuing final judgment, the Court below ruled on the Addus Motion.  After pointing out that Plaintiff had not responded, Judge Herndon reviewed the issue and found that the Addus Defendants were entitled to attorney's fees under 42 U.S.C. § 1988.  The Court made no mention at this time of 28 U.S.C. § 1927, or any other form of sanctions against Plaintiff's attorney.  Doc 130.

On February 21, the Plaintiff filed a Motion for Reconsideration.  Doc 134.  In his brief, Fedder objected to the award of attorney's fees under 42 U.S.C. § 1988 because the Complaint was not legally frivolous or factually groundless.  Fedder cited detailed and specific evidence from depositions, affidavits, and exhibits implicating the Addus Group, which he had presented to the Court in response to the Motions for Summary Judgment, as proof that the facts alleged in the complaint did have foundation from the outset.

The Plaintiff has attached Document 134 as an appendix for this Court's review.  A substantial portion, Doc 134, pp(9-20), was devoted to reviewing and organizing the mosaic of facts implicating the Addus Group in order to make the Plaintiff's theory of the case against Addus and the factual support for that theory clear.  Each fact is specifically supported by affidavits, deposition testimony, or exhibits taken from the Summary Judgment Record.  The Plaintiff asks that this Court incorporate that argument and documentation into the Record on Appeal.

In addition, Fedder objected that the Addus Defendants had not presented a lodestar

accounting of their costs, for him to review on behalf of Tate for reasonableness.

On May 21, Judge Herndon issued an Order denying Tate's Motion to Reconsider as to the decision to award attorney's fees to the prevailing Addus Defendants. Doc 145. However, he did order the Addus Defendants to submit a detailed accounting. Doc 146.

On June 5, 2012, Defendants submitted a detailed accounting, totaling $92,226.17. Docs 147-8.

On June 21, Plaintiff proceeded to file objections to it, both in terms of some particular billing items to which he objected, and also on the grounds that he should only be held accountable under 42 U.S.C. 1988 for the costs incurred by the Addus Defendants to prosecute the Rule 12(b)(6) Motion, at which point, if the Complaint was frivolous, the Court should have dismissed it. Doc 149.

On June 28, Judge Herndon denied Plaintiff's objections. At the end of his Memorandum, however, instead of ordering Mr. Tate to pay attorney's fees under 42 U.S.C. 1988, he suddenly ordered Fedder to pay the attorney's fees under 28 U.S.C. 1927. Doc 150.

Throughout this process, the Defendants never once asked for sanctions under 28 U.S.C. § 1927. Nor have they ever suggested that Fedder's conduct vexatiously or unreasonably multiplied the proceedings.

Judge Herndon brought this up *sua sponte*, and for the first time on June 28, 2012, nearly ten months after the case was closed, and nearly nine months after it was appealed. Doc 150. During the entire course of conduct of the case, up to that point, Judge Herndon never once gave Fedder any warning that his conduct was vexatious and that it unreasonably multiplied the proceedings. He never gave Fedder a Show Cause Order to explain why 28 U.S.C. § 1927 sanctions should not be imposed, and he never held any kind of a hearing to determine whether sanctions were justified, or what amount would be sufficient to deter such behavior in the future.

Judge Herndon never once met with any of the parties or their attorneys during the case,

9

either in person or by phone. All transactions with the Court were conducted in writing. And, prior to this side issue of awarding attorney's fees, the only writings at issue in the case were the pleadings filed by the parties, the Motions to Dismiss with their Responses, and the Motions for Summary Judgment with their Responses.

Judge Herndon explained that his decision to impose sanctions on Fedder was based upon his findings that the Complaint was without merit and that Fedder should have known better, if he had performed due diligence when investigating the claims.

Judge Herndon made no finding that Fedder multiplied the proceedings in the case. Judge Herndon made no finding that Fedder's conduct of the case was vexatious, or intended for an improper purpose or intent. Judge Herndon did find that Fedder's conduct of the case was unreasonable due to the alleged lack of due diligence. However, he never conducted any inquiry into whether or not Fedder did perform due diligence before filing.

## V. SUMMARY OF THE ARGUMENT

Judge Herndon treated 28 U.S.C. § 1927 and 42 U.S.C. § 1988 as if they were co-extensive and served the same purpose, except that in one case the plaintiff pays the attorneys' fees and in the other case the attorney pays. The two statutes are not at all the same.

Section 1988 is a fee-shifting statute intended to compensate the prevailing defendant for all of its reasonably incurred attorney's fees, when the plaintiff's case is completely without merit. It requires a finding that the complaint was legally frivolous and factually groundless.

Section 1927 is a sanction, intended to deter improper (bad faith) conduct by an attorney, *if* that conduct multiplies the proceedings unreasonably and vexatiously. The statute requires that the Court make findings that: (a) the attorney committed some explicit misconduct; (b) which multiplied the proceedings; (c) unreasonably; and (d) vexatiously. Even with such a finding, the sanction is limited to only the amount necessary to deter future misconduct of the type in question. It is also limited to the *excess* fees caused by the improper conduct.

Judge Herndon assessed Fedder for *all* the Defendants' attorney's fees.  The purpose was clearly compensation, and so it was an abuse of discretion.

Essentially Judge Herndon found that Tate's complaint was frivolous and groundless from the outset.  While that may show poor lawyering, it does not constitute a finding that he acted in bad faith, or even with reckless disregard for Addus' rights.  At worst, it is negligence, and it is not sufficient to find a violation of 28 U.S.C. § 1927 for vexatious misconduct.

In general merely filing a weak claim, without more, is not the type of conduct sanctioned by Section 1927.  While such action may cause the defendant extra expense, it is not what the Courts in the Seventh Circuit mean by "multiplying the proceedings."

Judge Herndon issued the sanction in this case against attorney Fedder in the amount of $92,000, without giving him notice or a hearing.  Fedder was never given any indication that his conduct was troublesome, no warning that it might be overzealous, and no opportunity to defend himself before the Court.  This is a clear violation of the Fourteenth Amendment.

In addition, the claims against Addus were clearly colorable, and either supported by law or by a good faith argument for extension of the law. As for the facts, Fedder presented a mosaic of facts implicating Addus.  The claim was clearly not factually groundless.

Finally, if the claims against Addus truly were frivolous from outset, Judge Herndon had a full opportunity to dismiss them at the Motion to Dismiss.  The only *excess* costs to Addus should have been for preparing the Motion to Dismiss.  Judge Herndon used some harsh words in his final Order – misrepresentation and malfeasance.  But Judge Herndon did not give a single example of a (bad faith) misrepresentation by Fedder before the Court.

## VI. ARGUMENT

### A. Standard Of Review

**T**he standard of review for imposition of sanctions on an attorney is abuse of discretion. That does not mean no appellate review.  *Pacific Dunlop Holdings v. Barosh*, 22 F.3d 113 (7th

Cir. 1994) (addressing Rule 11).

Sanctions have significant impact beyond the merits of the individual case, especially in civil rights cases. *Id.* They affect not only the individual attorney's reputation, but also the vigor and creativity of advocacy by other members of the bar. Serious policy concerns include: free access to the courts and enabling the continued enforcement of civil rights laws through private attorneys-general. Therefore, a district court's finding should be given less than total deference when sanctions are being reviewed. *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 936 (7th Cir.1989).

Civil rights plaintiffs rarely have money to conduct protracted litigation. Their attorneys can only be paid if they win. *A priori*, this gives the attorneys a strong incentive to vet the cases before filing. If attorneys now have to worry that they are going to become personal targets for large summary sanctions, they will not continue to practice in this area. Public policy favors civil rights enforcement through law. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 418-22. This holding directly undermines Congress' intent when it passed civil rights legislation.

In this case, Judge Herndon imposed Section 1927 sanctions on Fedder without warning or a chance to be heard, and he did so for the first time in his very last Order in this case. Doc 150. Prior to that point, the only Motion before the Judge had been a request by the Addus Defendants for attorney's fees made solely under the civil rights fee-shifting statute, 42 U.S.C. § 1988. This statute requires Plaintiff to pay. The Addus Defendants never once mentioned attorney sanctions under Section 1927.

But Judge Herndon suddenly, and purely on his own initiative, transformed this into a 28 U.S.C. § 1927 action. Doc 150, pp(9-11). He stated, as if Section 1988 and Section 1927 were just two sides of the same coin, that the Addus Defendants deserved compensation for their attorney's fees, but attorney Fedder should "shoulder the burden" Doc 150, p.10.

This raises Constitutional concerns of due process, which must be reviewed *de novo*. No

judge has discretion to impose sanctions of nearly $100,000 upon an attorney without giving him an opportunity to defend or explain his alleged mis-conduct.

In addition, this raises statutory concerns.  Judge Herndon's discretion is limited by the vehicle he used to issue his sanctions.  Judge Herndon had a choice among three possible approaches to impose attorney sanctions – Rule 11, 28 U.S.C. § 1927, or the "inherent authority" of the Court.  Each approach has constraints.

Invoking the inherent authority of the Court requires a finding of *bad faith* on the part of the offending attorney.  *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766-7 (1980). Fedder did not act in bad faith in this case, and Judge Herndon made no finding that he did.  Moreover, case law makes clear that the inherent authority of the Court to impose sanctions should only be used sparingly, when neither Rule 11 nor 28 U.S.C. § 1927 are sufficient to encompass the conduct being sanctioned.

Alternatively, invoking Rule 11 requires the Court to follow explicit procedural safeguards, which Judge Herndon did not provide.  For example, Rule 11 requires that the attorney be given formal notice and an opportunity to withdraw or renounce the offending pleading, before sanctions can be imposed.

With those constraints presumably in mind, Judge Herndon chose to invoke 28 U.S.C. § 1927 instead.  But this statute, as duly passed by Congress, only provides for sanctions for a specific type of dilatory behavior – conduct that is intentionally vexatious and multiplies the proceedings unreasonably.  It is not a fee-shifting statute.  If Fedder's conduct did not multiply the proceedings unreasonably, or if it was not intentionally vexatious, then sanctions do not apply as a matter of law, subject to *de novo* review.

Section 1927 does not mean free discretion of the Court.  A Judge is bound, *by law*, to obey the explicit constraints of the statute.  A Judge must also be constrained by the clear intent of Congress, as officially recorded in the Joint Committee Report of Congress accompanying the

statute.  No judge has discretion to ignore limits set by Congress, when imposing Section 1927 sanctions.  Questions of statutory interpretation require *de novo* review.

Judge Herndon's findings that: (a) Fedder filed a civil rights lawsuit without merit; and (b) he did so without exercising due diligence, if true, raise serious ethical questions.  But, without more, these findings simply do not trigger 28 U.S.C. § 1927 sanctions, *as a matter of law*.

Attorney Fedder also questions the Judge's factual finding that Tate's claims against Addus were completely without merit.  Ordinarily, the threshold determination: whether the civil rights' claims filed against the Addus Group of Defendants are frivolous in law and groundless in fact should require abuse of discretion review.  But, neither the parties nor their representatives have ever appeared before the Court in this case, either in person or by phone, for any reason.  Judge Herndon relied solely on the motions, exhibits, affidavits, and depositions presented in writing to the Court for and against summary judgment.

That summary judgment ruling is now under appeal as case 11-3252.  It is being appealed under a *de novo* standard because this Appellate Court has just as much insight into written documents as the District Court.  There is simply no reason for deference.

By the same token, Appellant Fedder believes this case presents no reason for deference. Judge Herndon has no knowledge of attorney Fedder other than what is in the written documents.

In Case 11-3252, the question is: Whether the Court properly found that the evidence presents no material issue of fact to decide.  On this appeal the question is: whether the Court properly found that the Plaintiff's claims were legally frivolous and factually groundless.

If an abuse of discretion standard is upheld in this case, that could potentially lead to the anomalous result that this Court could reverse the trial Court's summary judgment ruling against the Plaintiff (based on a *de novo* standard), but then uphold sanctions against Plaintiff's attorney (based on an abuse of discretion standard).  This Court should not allow for such contradictory

results to co-exist.

**B. Judge Herndon Did Not Make Findings That Fedder's Conduct Was Dilatory, Multiplicative, Or Undertaken In Bad Faith, As Required By 28 U.S.C. § 1927.**

Prior to 1980, attorney's fees were *not* authorized under 28 U.S.C. § 1927.  The statute provided for other forms of sanction to deter dilatory and vexatious conduct, but fines were small, and they were paid to the court, not opposing counsel.  In 1980, the Supreme Court ruled in *Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980), that a court can, under its inherent powers, award attorney's fees as sanctions for bad faith conduct by an attorney.  Soon after, as part of the Antitrust Procedural Improvements Act of 1980, Congress codified this inherent power by amending Section 1927 to add attorney's fees as a possible sanction:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

A plain reading shows that there are four *prima facie* elements which must be met before imposing sanctions: (1) action(s) by the attorney; (2) which multiply the proceedings; (3) unreasonably; and (4) vexatiously.  See *Overnite Transportation Co. v. Chicago Industrial Tire Co.*, 697 F.2d 789, 794 (7th Cir.1983).

A plain reading also shows that the statute limits penalties that can be imposed to no more than the *excess* attorney's fees caused by vexatious attorneys.  The statute is *not* designed to compensate the opposing party for its *entire* legal bill.  The purpose is to deter specific dilatory and vexatious conduct.

Judge Herndon stated: "District Courts possess the authority to require an attorney to pay their opponent's attorney's fees under certain circumstances.  *See* 28 U.S.C. 1927."  Doc 150, p(10).  But this appears to be a misreading of the statute.  District Courts have the authority to order excess fees paid, *if* directly caused by the multiplicative and vexatious conduct of an

attorney.  But Section 1927 was never intended to provide opposing counsel with an alternative means for recovering its attorney's fees.

### (1) JUDGE HERNDON FAILED TO IDENTIFY A WRONGFUL *ACTION* BY FEDDER OF THE TYPE PROSCRIBED BY 42 U.S.C. § 1927.

Assuming Judge Herndon's primary intention was to sanction Fedder and not compensate Addus, it must be true that the specific vexatious act Herndon intended to sanction was the filing of the Complaint itself.  Since Section 1927 only authorizes a judge to impose sanctions for "the *excess ... attorneys' fees* reasonably incurred because of such [vexatious] conduct," and since Herndon ordered Fedder to pay *all* of Addus' legal fees, he must have believed the entire action against Addus was *vexatious and dilatory* from the start.

However, Judge Herndon did not even raise the prospect of charging attorney's fees to Fedder until the very last document in the case.  This Order was issued some ten months after Final Judgment.

The Court had previously ordered the Plaintiff, Tate, to pay full attorney's fees (under 42 U.S.C. 1988) for a frivolous complaint.  Docs 130, 145.  Judge Herndon had had plenty of time to consider whether Fedder should "shoulder the burden" of attorney's fees, instead of his client.  Yet, this did not even occur to Judge Herndon until his very last order in the case – Doc 150.

So: One may wonder: What circumstance changed at this late date, ten months after the case was closed, which caused Judge Herndon to decide suddenly that Fedder should "shoulder the burden" of attorney's fees?  Why did it take Judge Herndon so long to determine that the Complaint was vexatious from the start?

Furthermore, these sanctions were issued in response to a Motion by Addus that did not even ask for sanctions.  The Addus Defendants only asked for compensation from the Plaintiff.

Judge Herndon did not attempt to explain why Fedder should be sanctioned for his conduct of the case, until the last three pages of Document 150 (pp. 9-11).  At that point, he used

16

some harsh words – "misrepresentation" and "malfeasance".  But he had never previously warned Fedder.  And, he did not cite a single concrete act of deliberate misrepresentation or malfeasance by Fedder.

The only specific *findings* Judge Herndon cited to support his conclusion of sanctionable conduct were findings taken from his Order granting summary judgment:

> 1.  Tate offered no evidence that any of the Addus Defendants took concrete job actions against him, such as to terminate, discipline, or lower his compensation.

> 2.  Tate admitted at deposition that he had no direct evidence or personal knowledge of the conspiracy against him.

> 3.  The claim against Addus for retaliation was legally frivolous under Seventh Circuit law because the Equal Protection Clause does not have a cause of action for retaliation.  See *Boyd v. Illinois State Police*, 384 F.3d 888, 898 (7th Cir. 2004).

> 4.  Plaintiff has offered no direct evidence that anyone took action against him due to his race.

Doc 114.

It was the Court who insisted upon using the limiting phrases "*personal* knowledge" and "*direct* evidence" in these findings, and who also insisted incorrectly that the Addus Defendants cannot be held liable unless they personally took adverse employment actions against Tate.  Tate has admitted from the start, for example in Response to the Motion to Dismiss, that the Addus Defendants did not control his conditions of employment.  He has never misled the Court on this point.  To the contrary, he made clear that he alleged that the Addus Defendants conspired with the DRS Defendants to create a hostile environment for him and to bear false witness and otherwise help enable DRS to take adverse job actions against him.  Response to Motion to Dismiss, Doc 26, p. 2.

If such a charge is not enough to state a claim, then Judge Herndon should have dismissed those claims at the Motion to Dismiss, based on Tate's admissions.  He did not do so.

Likewise, if Judge Herndon thought that retaliation is not actionable under section 1983, due to the holding in *Boyd*, then he should have dismissed the retaliation claim against all of the individual defendants at the Motion to Dismiss. Section 1981 does not even address sex discrimination, and Title VII and the ADA only apply to the employer. So, if it were clearly true that the Seventh Circuit does not permit retaliation claims under Section 1983, then again Judge Herndon should have dismissed all retaliation charges against Addus at the Motion to Dismiss stage. He did not.

But in any event, while arguing on behalf of his client, Fedder made a good faith argument, right or wrong, that *Boyd* is no longer good law, in light of the more recent Supreme Court holding in *CBOCS West, Inc. v. Humphries* 553 U.S. 442 (2008) (holding that Section 1981 permits retaliation claims even though there is no express language saying so). Judge Herndon is entitled to reject that argument, but not to sanction Fedder for making it. That would be an abuse of discretion.

Tate has also admitted from the start that he had no "personal knowledge" or "direct evidence" of the conspiracy he alleges. But the law does not limit plaintiffs to using only personal knowledge to prove the existence of a conspiracy. There were many pieces of circumstantial evidence against the Addus Defendants. For example, Tate presented direct evidence (including written exhibits presented by other witnesses), that Ms. Evans fired his top support staff on trumped-up misconduct charges and then replaced them with her sister and her daughter. He also presented an affidavit from a former client that Evans' sister (Kohler) spied on him and attempted to trump-up a false disciplinary charge against him. In addition, he presented direct evidence that one of the Addus Defendants (Humphrey) was regularly spying on him. On an almost daily basis, a message would appear on his computer screen telling him that she was rummaging through his client case files from her computer in Carbondale. The Defendants offered a pretext that she was helping. But Humphrey herself testified that during the time frame

in question, she had not yet been assigned to help him, and Tate averred that she never actually offered assistance or discussed any cases.  Admittedly, Tate only inferred that her purpose in reading his case files was to find something to discipline him for.  But that inference was supported by the fact that Humphrey did initiate a disciplinary action against him based upon something she found in one of his cases.  See Doc 134 pp(9-20).

The Plaintiff further presented indirect evidence that this must have been part of a conspiracy, or coordinated effort with Supervisor Ancell.  For example, the DRS computer specialist averred that Ancell was the only one who could have given Humphrey the password, enabling her to search through his case files from her computer in Carbondale.  Why else would Ancell have done that?  *Id.*

It is perplexing that the Court did not consider this type of evidence to be relevant, simply because Tate did not have personal knowledge *and* direct evidence that Ancell and Evans actually talked about spying on him.  Circumstantial evidence is just as permissible as direct evidence.  And, the testimony of other witnesses and the evidence in written documents are just as pertinent to the cause of action as Tate's personal knowledge.

Still, even if one assumes these four findings by Judge Herndon were correct in substance, and encompassed the entire scope of Tate's evidence (which they clearly did not), there is nothing in these findings to show that Fedder's conduct was vexatious or dilatory.

At best, Judge Herndon's findings show that he found Plaintiff's Complaint to be objectively unreasonable – *i.e.*: (a) the claims were without merit; and (b) a prudent attorney, making reasonable inquiry, would have known they were without merit.  In Judge Herndon's own words: "The case against the Addus defendants should have never been brought and had plaintiff's counsel done his homework beforehand these claims would not have been brought." Doc 150, p(10).  This language does not suggest a finding that Fedder intentionally brought an action against Addus, which he *knew* should not have been brought.  It does not show he had

19

some other vexatious purpose, such as to bully or intimidate.

But that would make this a better subject for Rule 11 sanctions. The inquiry under Rule 11 is whether the pleadings are improper. The standard of review is one of "objective reasonableness under all the circumstances of the case." *FDIC v. Tekfen Constr. & Installation Co.*, 847 F.2d 440, 442 (7th Cir.1988).

While it is disturbing to Fedder that he stands accused of filing an objectively unreasonable complaint, such a finding shows incompetence, or negliegence. It does not meet the specific criteria for sanctions under 28 U.S.C. § 1927. A section 1927 inquiry must involve something more than a meritless, or even objectively unreasonable pleading. *McCandless* 697 F.2d at 200-02.

First, even if claims against one defendant in a case are objectively unreasonable, that does not establish that filing those claims was dilatory, *i.e.* intended to delay or harass. *Reid v. United States*, 715 F.2d 1148, 1154 (7th Cir. 1983) (fees not assessed because no delay). Second, although filing an objectively unreasonable complaint may be evidence of vexatious intent, it is not sufficient evidence by itself. *McCandless, supra.* In some instances, unreasonable actions may be intended to be vexatious; in other instances they may not.

Section 1927 states that: to be sanctionable, wrongful conduct (such as a meritless pleading) must "multiply the proceedings" both "unreasonably" and "vexatiously." That requires a finding that the wrongful conduct actually multiplied the proceedings, and also a finding that the misconduct was something more than just "unreasonable." There must also be an irreducible element of (vexatious) intent. *Suslick v. Rothschild Sec. Corp.*, 741 F.2d 1000, 1006 (7th Cir. 1984).

In any event, Rule 11 and Section 1927 are not co-extensive. They do not sanction the same behavior (meritless pleadings vs. dilatory and vexatious conduct of the case). They do not have the same standard of review. (unreasonableness vs. bad faith). And, they do not have the

20

same procedural prerequisites.

This last difference may be why Judge Herndon invoked 28 U.S.C. § 1927 instead of Rule 11.   Judge Herndon issued this sanction, *sua sponte*, in his very last order in the case (Doc 150), without any notice to Fedder at all.  But Rule 11 has elaborate and explicit procedural protections which Judge Herndon did not follow.  Instead, he chose a path of lesser resistance – 28 U.S.C. 1927.

Beyond the pleadings, Judge Herndon did not cite any further specific acts by Fedder which were even arguably vexatious or dilatory, because there were none.  Nor did he cite any warnings that he gave to Fedder, because there were none.

In fact, neither the parties nor their attorneys ever once appeared before Judge Herndon either in person or by phone.  The only evidence Judge Herndon had of vexatious conduct were the written documents – being the Complaint, and the Responses to the Motion to Dismiss and the Motion for Summary Judgment.

The question then becomes: How did Judge Herndon make the leap from concluding that the Complaint was legally frivolous and factually groundless to concluding that Fedder filed that complaint with vexatious purpose?

Judge Herndon opined that a reasonably prudent attorney should have known better, if he had done his homework.  But, that just re-states the objectively reasonableness standard.  It does not prove that Fedder's complaint was dilatory or vexatious.  Besides, Judge Herndon never even conducted an inquiry to find out if Fedder did do his homework.

If given notice and a hearing, Fedder could have presented his billing hours spent preparing the Complaint.  He could have shown the Court his extensive intake notes from several 2-hour intake meetings with Tate.  He also could have shown the Court the case law that he collected and reviewed.  It is mere speculation for Judge Herndon to assume that Fedder did not do his homework.

By its plain language, Section 1927 only addresses *dilatory* conduct.  There may be instances wherein filing a complaint or other pleading is used as a tactic to delay some other legal action or multiply the proceedings, but this is not one.

In addition, Section 1927 only addresses *vexatious* conduct.  There may be instances where a complaint or other pleading is filed to bully or harass the opposing party into settlement, but this is not one.

It follows that Fedder's "improper" conduct, as Judge Herndon characterized it, does not fall into the ambit of misconduct sanctionable under Section 1927.

In *Dahnke v. Teamsters Local 695,* 906 F.2d 1192, in a case with factual findings by the trial Court that are similar to this case, the Seventh Circuit noted that: "Section 1927 and Rule 11 are addressed to different conduct. ... Sec. 1927 ... does not require 'reasonable' investigation."  It concluded that: since the basis for the District Court's sanctions was failure to investigate, "and not that Dahnke's attorney 'multiplie[d] the proceedings ... unreasonably and vexatiously,'" Section 1927 sanctions were not implicated in the case.

For the same reason, Section 1927 is not implicated in Tate's case.  It was an abuse of discretion for Judge Herndon to issue this sanction, solely to punish Fedder for allegedly failing to make sufficient inquiry before filing.

Furthermore, if Judge Herndon believed Fedder's conduct was becoming sanctionable, he should have issued a Show Cause Order much earlier in the case, so the matter could be argued and resolved in a timely manner.

It was an abuse of discretion that he never gave Fedder a chance to answer the charges, for example by making a record that he did perform due diligence.

It was a further abuse of discretion that Judge Herndon waited until ten months after this case was closed to suddenly find, for the first time and on his own initiative, that the original Complaint in this case was dilatory, unreasonable, and vexatious.

Finally, Fedder believes it was an abuse of discretion for Judge Herndon to sanction Fedder nearly $100,000, merely because Judge Herndon erred by not dismissing all the charges at the Motion to Dismiss stage, due to the supposedly frivolous nature of the claims.

## (2) FEDDER DID NOT CONDUCT THIS CASE IN A MANNER THAT MULTIPLIED THE PROCEEDINGS.

With respect to the second *prima facie* element, Judge Herndon found the claims filed by Fedder against Addus were objectively unreasonable.  As already discussed under element (1), Rule 11 was specifically designed to deal with instances of *meritless* written pleadings, or pleadings offered for an improper purpose.

By contrast, Section 1927 was designed to deal with conduct that multiplies the proceedings.  28 U.S.C. Sec. 1927; *Ross v. City of Waukegan*, 5 F.3d 1084, 1089 n. 6 (7th Cir.1993); *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184 (7th Cir.1992)  But Judge Herndon failed to make any finding or give any explanation of how Fedder's conduct of the case after filing the Complaint was designed to delay or "multipl[y] the proceedings".

The cases successfully invoking Section 1927 in the Seventh Circuit rarely if ever deal only with the complaint (unless the complaint multiplies some other prior proceeding).  See, e.g. *Kapco Mfg. Co., Inc. v. C & O Enters, Inc.*, 886 F.2d 1485 (7th Cir. 1989) ("Friedman filed the second complaint for the express purpose of avoiding the district court's order and shopping for a different forum.").  They also practically never order one attorney to pay the entire legal bill for the opposing party.  See, e.g., *Burda v. M Ecker Co.*, 2 F.3d 769 (7th Cir 1993) (attorney should pay $1,000 for bad faith pleading, with the client paying $7484.50).

In this case, Judge Herndon summarily found that the Complaint against Addus was frivolous, and that an objective attorney in Fedder's position would have known that it was.  But being frivolous or even unreasonably frivolous is not the same as being multiplicative or dilatory.  Fedder understands that a person could argue that because the complaint was frivolous,

it was necessarily multiplicative for the Defendant even to have to answer the Complaint. But Section 1927 talks about conduct that "multiplies the *proceedings*". This is a clear reference to court proceedings. It does not refer more generally to conduct that adds to the work the opposing attorney must perform. That standard would have no end.

Judge Herndon's interpretation of Section 1927 in this case to hold that merely filing a complaint "multiplies the proceedings" is so overbroad as to be an abuse of discretion. Under that standard, every complaint deemed by a court to be without merit would be sanctionable under Section 1927 for full attorney's fees, thereby chilling the work of attorneys.

Judge Herndon's confusion on this point may stem from the abrupt manner in which he reached this conclusion in his final document in the case, without argument. The Motion put forth by the Addus Group at the time, which Judge Herndon was supposed to be deciding, sought compensation for attorney's fees under 42 U.S.C. § 1988, not sanctions under 28 U.S.C. § 1927. 42 U.S.C. § 1988 is a fee-shifting statute, used in civil rights cases to *compensate* the prevailing party, when applicable, for its legal fees. Under 42 U.S.C. § 1988, it is the losing party (not his attorney) who must compensate the prevailing party. Typically, this would mean *all* reasonably incurred legal fees, not merely the *excess* fees resulting from specific dilatory and vexatious action. Nor does 42 U.S.C. § 1988 even require a showing of vexatious or dilatory conduct.

Based upon Judge Herndon's own language (cited in part (1) above) it appears that he decided to mix and match the two statutes. On the one hand, he decided that Addus deserved to be compensated in full for its legal fees, per 42 U.S.C. § 1988. But, on the other hand, he decided that Fedder should shoulder the full burden of those fees, not his client. Therefore, at the last minute, *sua sponte*, and without a hearing of any kind, Judge Herndon suddenly decided to invoke an altogether different statute, 28 U.S.C. § 1927, as if it had the same standard of review, the same compensatory purpose, and the same broad applicability as 42 U.S.C. § 1988.

This was plain error. Section 1927 was designed to *deter* specific attorney conduct that is

*dilatory*, not to *compensate* the opposing party for a *frivolous* lawsuit.  In amending section 1927 in 1980, Congress intended to prevent delays in litigation proceedings, not to compensate the opposing party for a frivolous lawsuit. See H.R. CONF. REP. No. 1234, 96th Cong., 2d Sess. 8 (1980), *reprinted in* 1980 U.S. CODE CONG. & *ADmN*. NEws, 2716, 2782.

Judge Herndon has never made any finding that Fedder delayed the proceedings in this case.  Indeed, it is quite clear that Fedder did not.  Even if Plaintiff had not filed his claims against the Addus Defendants at all, but merely against the DRS Defendants, the *proceedings* would have gone through the same stages – from Complaint to Motions to Dismiss to Discovery and thence to Motions for Summary Judgment – in much the same time sequence.  See *e.g. Reid v. United States*, 715 F.2d 1148, 1154 (7th Cir. 1983) (fees not assessed because no delay).

There were no delays or special hearings caused by Fedder's conduct of the case.   His conduct did not multiply the proceedings at all – whether necessarily or unnecessarily, and whether vexatiously or in good faith.

It is also noteworthy that the Addus Defendants never claimed Fedder's conduct was dilatory.  Nor did they ever ask for sanctions.  This was purely Judge Herndon's idea.  But since Judge Herndon never identified any act that multiplied the proceedings, or that caused delay to the Court, Judge Herndon failed to establish a valid reason for Fedder to be sanctioned under 28 U.S.C. § 1927.

### (3).  JUDGE HERNDON INCORRECTLY APPLIED AN OBJECTIVE UNREASONABLENESS STANDARD.  THE CORRECT STANDARD IS BAD FAITH.

With regard to the fourth element of 28 U.S.C. § 1927, Judge Herndon did not make any specific finding of fact, nor even conduct an inquiry into whether Fedder acted intentionally, much less with improper and *vexatious* purpose, such as to bully or delay.  Judge Herndon merely found that: (a) the claim against Addus was meritless; and (b) a reasonably prudent attorney, acting with due diligence, would not have filed it. Doc 150, p.(10).

This amounts to saying that Fedder's behavior in filing claims against the Addus Group was objectively unreasonable.  Indeed, Judge Herndon stated explicitly that that was sufficient under the law to impose sanctions.  Doc 150, pp. 10-11.  As noted above, objective unreasonableness may be the proper standard for a Rule 11 sanction.  It is the wrong standard for section 1927, as a matter of law.

Simply put, 28 U.S.C. 1927 requires a finding of actual and improper intent on the part of the offending attorney, whether this finding be direct or circumstantial.  *Suslick v. Rothschild Sec. Corp.*, 741 F.2d 1000, 1006 (7th Cir. 1984); *Overnite Transportation Co. v. Chicago Industrial Tire Co.*, 697 F.2d 789 (7th Cir.1983).  Judge Herndon made no such finding.

At first instance, this is a matter of statutory interpretation.  28 U.S.C. 1927 states: "Any attorney ... who so multiplies the proceedings ... unreasonably and vexatiously may be required [to pay] attorneys' fees reasonably incurred because of such conduct."

To multiply the proceedings "unreasonably", without more, would invite an objective unreasonableness standard of review, such as Judge Herndon prescribed.  But Congress chose to add the word "vexatiously".  The attorney's specific conduct which multiplies the proceedings must be *both* unreasonable *and* vexatious, before sanctions would apply.  If the word vexatious is not to be treated as superfluous, then it must mean something more than just objectively unreasonable.

Webster's Third New International Dictionary defines the verb "to vex" in relevant part: "... to irritate or annoy by or as if by petty provocations ... ."

But Section 1927 does not merely ask whether the attorney's conduct vexed – *i.e.* irritated or annoyed – opposing counsel or the Court.  It asks whether the attorney acted vexatiously.  The adverbial form "vexatiously" must modify a specific action.  It is the offending attorney, who must act vexatiously, not the Court who must be vexed.

Webster's subsumes this adverbial form of the word under the adjectival form

26

"vexatious".  It defines vexatious in relevant part: " ... lacking justification and intended to harass" as in "(the company's [vexatious] refusal to pay a patently valid claim)".  Accord, *Overnite Transportation Co. v. Chicago Industrial Tire Co.*, 697 F.2d 789 (7th Cir.1983), noting explicitly that "'vexatious' is defined as 'lacking justification and intended to harass.'"

It follows that the statutory phrase: to "multipl[y] the proceedings . . . vexatiously" means to do so without justification and with intent to harass, such as to bully the opponent or delay and multiply the proceedings in order to force a settlement. See, e.g., *Suslick,* 741 F.2d at 1006 (7th Cir. 1984). (holding that terms "vexatious and unreasonable" require courts to consider attorneys' bad faith).  In short, if the word "vexatiously" in the statute is given its dictionary definition, Section 1927 requires that the offending attorney act with improper *intent*.

The history of Section 1927, both judicial and legislative, reinforces this point.

First, the American Rule requires each party to bear his own legal fees unless the other side acts in *bad faith*.  See *Alyeska Pipeline Service Co. v. Wilderness Society* 421 U.S. 240 (1975).   The only court-recognized exceptions are: (a) situations that generate common funds; and (b) actions in which a statute specifically provides a fee award as compensation to the *prevailing* party (such as 42 U.S.C. § 1988).

Under Section 1927, a court need not consider whether the vexatious attorney represents the prevailing party or the losing party. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 762 (1980). The purpose of Section 1927 is to deter dilatory conduct by attorneys (whether losing or winning); it is not to compensate the *prevailing* party for their attorney's fees.  House Conf.Rep. No. 1234, 96th Cong., 2d Sess. 8, reprinted in 1980 U.S.Code Cong. & Ad.News 2781, 2782 ("Conference Report").  Therefore, Section 1927 is not a fee-shifting statute at all, and so does not fall into the exception to the American rule.  *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985).  That leaves bad faith as the proper standard of review.

Second, invoking Section 1927 to sanction an attorney is akin to invoking the court's

inherent powers.  See *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986).  But to invoke

its inherent powers, a court again must find that the attorney acted in bad faith.  *Roadway*

*Express,* 447 U.S. at 766-7.

> Third, Congress explained its intent to require bad faith, as well as the policy behind it:

>> [A] rule permitting the imposition of attorneys' fees under Section 1927 *only where the attorney* **intentionally** *acts without a plausible basis* is proper. Such a rule protects three important interests. First, is the societal interest in encouraging free access to the courts. Second is the interest of the client in obtaining legal counsel who otherwise might be chilled from taking a close case. Third is the lawyer's ethical obligation to represent his or her client zealously within the bounds of the law. Congress, in allowing attorneys' fees to be assessed under section 1927, was concerned "that the provision ... in no way dampen the legitimate zeal of an attorney in representing his client."

Conference Report at 8.  (Emphasis added.).

It is not enough for a Court to find that an attorney acted carelessly to multiply

proceedings, or even that his behavior showed reckless disregard for the orderly function of the

court, and thereby caused vexation to the Court or the opponent.  He must have had an *intention*

to act without a plausible basis.  As applied to this case, <u>that</u> means Fedder must have

intentionally filed his claims against Addus, even though he had actual knowledge that they were

without merit.  This is clearly a bad faith standard.

Border line cases can be subtle, but the Court still must make a proper finding.  In

*Maneikis v. Jordan*, 678 F.2d 720, 722-23 (7th Cir. 1982) the Court found that counsel "must

have known" that the procedural step in question which multiplied the proceedings lacked any

merit, not merely that he "should have known" if he had exercised due diligence.

Judge Herndon made no such finding in this case.

The earliest cases in the Seventh Circuit to interpret the amended Section 1927 statute all

made this same interpretation.  See *Suslick v. Rothschild Securities Corp.*, 741 F.2d 1000 (7th Cir.

1984) (holding that attorney's fees were not justified because "neither the appellant nor her

28

counsel acted with bad faith"); *Overnite Transportation Co. v. Chicago Industrial Tire Co.*, 697 F.2d 789 (7th Cir.1983) ("we hold that the district court abused its discretion in ordering the attorneys for Overnite to pay . . . attorney's fees and costs [under 28 U.S.C. § 1927] [b]ecause the attorneys for Overnite had a reasonable belief based upon a logical (albeit incorrect) interpretation of the law, and prosecuted the lawsuit in an orderly and timely fashion."); and *McCandless v. Great Atlantic and Pacific Tea Co., Inc.*, 697 F.2d 198, 201 (7th Cir.1983) (district court explicitly found bad faith). These Courts all took the time to do statutory interpretation, examining the text and the intent of Congress as set forth in the Joint Committee Report. Their holdings have never been overturned by the Seventh Circuit. See also *Reid v. United States*, 715 F.2d 1148, 1154-5 (7th Cir. 1983) (requiring a degree of culpability and bad faith on the part of counsel).

Of course, to prove bad faith does not require that the offending attorney admit that he acted with vexatious intent. As with any other factual question, intent can be inferred. *McCandless* 697 F.2d at 201. Thus, the filing of a suit that is obviously meritless, and objectively unreasonable, is probative evidence of possible bad faith. But, "a finding of meritlessness [by itself] will not support a finding of bad faith." *McCandless* 697 F.2d at 200-02 (citing *Driscoll v. Oppenheimer*, 500 F.Supp. 174, 175 (N.D.Ill.1980)). There must be something more.

In McCandless, the trial Judge "based his finding of bad faith upon the following factors: (1) the obvious meritlessness of the section 301 claim; (2) the failure to provide any factual or legal support for the sundry constitutional claims; (3) counsel's omission of a key sentence from a quotation; and (4) the failure to respond to defendant's motion for fees and costs." *Id.*

In reviewing that decision, the Seventh Circuit concluded that factors (1) and (2) are insufficient by themselves to show bad faith. Improper intent was evidenced by factors (3) and (4), together with the lame excuses offered by the attorney upon the Judge's inquiry. *Id.*

On that basis, the trial Judge found as a matter of fact that plaintiff's counsel *knew* that plaintiff had failed to meet a statutory exhaustion of remedies requirement before filing suit, and the Seventh Circuit upheld that finding of fact.  *Id*.

"Before a court may assess fees under section 1927, the attorney must intentionally file or prosecute a claim that lacks a plausible legal or factual basis."  *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 227 (7th Cir.1984).

Judge Herndon did not make a finding that Fedder *intentionally* filed or prosecuted a claim that he knew lacked a plausible legal or factual basis.  Therefore, unless this Court finds that the record speaks for itself in showing that Fedder intentionally filed a meritless claim, this Court should find Judge Herndon's action was an abuse of discretion.

In deciding to impose sanctions, Judge Herndon adopted the much lower standard of objective unreasonableness.  Doc 150, pp(9-11). Altogether, he cited five cases in support of his position.  From each case, he cited a single sentence of dicta as if it were the holding of the case.  But in each instance, these sentences had nothing to do with the actual holding of the case.

Not even one of these five cases actually found that it was proper under Section 1927 for a trial court to issue sanctions against an attorney solely on the basis of his finding that: (a) the pleadings were without merit; and (b) no reasonable prudent attorney would have filed such a complaint.

To review these cases:

> 1. *Ross v. City of Muskeegon* 5 F.3d 1084, 1089 (7th Cir. 1993) – Judge Herndon cited note 6  for the principle that sanctions are appropriate when the attorney shows: "a serious and studied disregard for the orderly process of justice."
> But in the first place, this was just dicta.  The Court made no attempt to break down what might constitute a "serious and studied disregard for the orderly process of justice."  In the second place, *sanctions were denied in this case.*  As the Court explained: "Before sanctions may be imposed under Sec. 1927, a party must show 'bad faith.'"

2. *Kapco Mfg. Co., Inc. v. C & O Enters, Inc.*, 886 F.2d 1485, 1491 (7th Cir. 1989) was cited for the principle that sanctions are appropriate "when an attorney pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound."

This too was dicta which had nothing to do with the holding of the case. The Seventh Circuit did not hold that sanctions were appropriate without a showing of bad faith. To the contrary, according to the Seventh Circuit, the district Court "found that Kapco and Friedman 'engaged repeatedly in duplicative and vexatious tactics fraught with bad faith in an attempt to unnecessarily prolong this litigation, to harass the defendants, and to drive them out of business.'"

3. *Burda v. M Ecker Co.*, 2 F.3d 769, 777 (7th Cir 1993) for the principle that sanctions are appropriate "where a 'claim [is] without a plausible legal or factual basis and lacking in justification;'".

Again, this is dicta. The District Court awarded sanctions under Rule 11. Rule 11 uses the objective unreasonableness standard referred to in the quote above. The District Court did not apply section 1927, and so it did not discuss whether that standard was met. However, the Seventh Circuit, in upholding the sanctions, added its own analysis to the case. It said: "Based upon the explicit findings of the District Court, Section 1927 sanctions would have been appropriate as well." They were supported by "the district court's findings that the lawsuit was insupportable and pursued merely to vex M. Ecker and "bully" a settlement." The Seventh Circuit also noted that appellant did not challenge these findings on appeal.

4. *Dahnke v. Teamsters Local 695,* 906 F.2d 1192, 1201 (note 6) (7th Cir. 1990) for the principle that Section 1927 imposes a duty "to dismiss claims that are no longer viable."

This too is dicta. The *Dahnke* opinion is entirely based on Rule 11. Note 6 is merely a comment addressing what might have been done under Section 1927. But what is most significant is the part of Note 6 that Judge Herndon left out. "Neither the district court nor the appellees in this case has claimed that section 1927 sanctions are warranted against *Dahnke*'s attorney, and, as we recognized in *Samuels v. Wilder*, 906 F.2d 272 (7th Cir.1990), '[s]ection 1927 and Rule 11 are addressed to different conduct ... Sec. 1927 differs from Rule 11 because it does not require 'reasonable' investigation.' Since the basis of Judge Shabaz's imposition of sanctions seems to have been Dahnke's failure to investigate the legal foundation for his claim before filing it in federal court ('Any reasonable person should have known that Local 695 did not breach its duty of fair representation,' Order at 16 (W.D.Wis. Aug. 30, 1988))--and not that Dahnke's attorney 'multiplie[d] the proceedings ... unreasonably and vexatiously,'--section 1927 is not implicated here."

In short, note 6 actually holds that: *Failure to investigate a claim properly is not sufficient basis for sanctioning an attorney under Section 1927.*

31

    5. *Pacific Dunlop Holdings v. Barosh*, 22 F.3d 113, 120 (7th Cir. 1994) for the principle that *objective* bad faith is sufficient.

    This is also dicta. In the Court's own words: "This is an appeal from the district court's award of $138,015.11 in legal fees and costs to Appellees under Federal Rule of Civil Procedure 11 and 28 U.S.C. Sec. 1927. For the reasons stated below, we reverse." It is impossible to conclude from such a holding that an objective standard is sufficient to sanction an attorney under Section 1927.

In summary, Judge Herndon has not cited a single legal precedent which holds, on the facts of the case, that objective unreasonableness is the standard for finding vexatious conduct, or that merely showing that Fedder filed a meritless complaint and failed to show due diligence is enough to justify a finding that he violated the specific requirements of 28 U.S.C. § 1927.

Nor has Judge Herndon made any finding or presented any evidence that Fedder acted with vexatious intent or multiplied the proceedings against the Addus Defendants. Judge Herndon also has failed to present any evidence that there was some point in this case when the complaint became "no longer viable" (per the dicta from Dahnke). So, even if there were a duty under Section 1927 to drop the case at that point, it is a vacuous duty when applied to this case.

The committee notes accompanying the amendment of Section 1927 (cited above) warn courts to be circumspect in applying sanctions, and not to stifle zealous or creative advocacy. Judge Herndon failed to explain why Fedder's conduct of the case surpassed the bounds of zealous and creative advocacy. Nor has he provided standards or guidelines for a civil rights attorney to know in the future if he has crossed the line.

As a matter of law, Judge Herndon used the wrong standard of review. He should have required a showing of bad faith. The allegations recited against Fedder by Judge Herndon, even if entirely true (which they are not) do not establish bad faith.

Therefore Judge Herndon's award of attorney's fees must be reversed, as a matter of law.

**C. Fedder Was Denied Notice And A Hearing In Violation Of His Fourteenth Amendment Right To Due Process.**

On September 1, 2011, Judge Herndon issued his Order and Final Judgment as to the substantive matters of this case.  On October 3, the Addus Defendants made a motion for compensation in the form of full attorney's fees under 42 U.S.C. § 1988.

As noted in the fact section above, Fedder did not actually receive notice of this Motion at the time, due to his Mother's cereberal hemorrhage.  But the District Court found that he had constructive notice.  In any event, he made a belated, but thorough argument on behalf of his client. Doc 134.

42 U.S.C. § 1988 is a fee-shifting statute.  It awards attorney's fees to the prevailing party and targets the losing party, not the attorney.  Such an award is permitted when a complaint is both legally frivolous and factually groundless.  *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 420 (1978).

In response to the Addus Motion, and in light of *Christiansburg,* Fedder focused upon proving that the claims against the Addus Group were at least colorable.  He cited a number of exhibits, affidavits, and deposition testimony, which he had previously entered into the record in opposition to summary judgment, as proof that not only had he filed his claims in good faith, but he had backed them up with concrete evidence.  Doc 134.

On June 21, 2012, Judge Herndon issued his final memorandum and order addressing the matter of attorney's fees. Doc 150.  On the last three pages of that Memorandum, he suddenly changed the terms of the entire argument and ordered Attorney Fedder to pay the Addus Group's attorney's fees 28 U.S.C. § 1927,.  These fees totaled $92,226.17.

Fedder had never before been given notice that sanctions were being considered against him, under 28 U.S.C. § 1927.  At no time during the substantive review of the case was Dr. Fedder warned, even informally, that his conduct of the case might be improper.  Even after

summary judgment, while the Court deliberated over attorney's fees, it still gave no indication

that it might consider sanctions under Section 1927, rather than Section 1988.

This was a fundamental violation of Fedder's right to notice and an opportunity to be

heard. At any time during the ten months after summary judgment was granted and before

attorney's fees were summarily awarded, Judge Herndon could have issued a Show Cause Order

giving Attorney Fedder the opportunity to present reasons in writing why he should not be

sanctioned. Or, he could have called a special hearing to discuss this matter. He did not do so.

Instead, he waited until the very last Order in the case, and the very last three pages of

that Order to announce suddenly that Fedder should pay the attorney's fees under 28 U.S.C. §

1927. This gave Fedder no opportunity to defend himself, except by appeal.

Judge Herndon pivoted from 42 U.S.C. § 1988 to 28 U.S.C. § 1927 without reflection

and without even an attempt to resolve the differences between the two statutes. He merely said

that Addus was entitled to full compensation because the claims were frivolous. But, rather than

make the client pay, he chose to make attorney Fedder "shoulder the burden", as punishment for

his alleged lack of due diligence in preparing the Complaint.

Judge Herndon apparently thinks these two statutes are essentially the same, except with

a different payor. They are not. They have different burdens of proof (meritless claim vs.

vexatious conduct that multiplies the proceedings), different standards of review (objectively

unreasonable vs. intentional bad faith), and different penalties (paying all reasonable attorney's

fees vs. paying only the *excess* fees caused by the vexatious conduct).

42 U.S.C. § 1988 reverses the American Rule on fee-shifting. It is usually invoked by the

prevailing plaintiff in a civil rights case. In extreme cases, it can be invoked by the prevailing

defendant if a plaintiff files claims that are legally frivolous or factually groundless from the

outset. *Christiansburg Garment.* It *compensates* the defendant for an obviously frivolous

lawsuit.

34

To establish a section 1988 claim, the defendant must prove that it was without merit from the start.   But the defendant need not prove that it was offered for an improper purpose, such as to bully or harass. The standard of review is objective unreasonableness.  When applicable, the statute entitles the prevailing attorney to receive *all* reasonable attorney's fees in compensation.

28 U.S.C. § 1927, by contrast, applies only against an attorney who unreasonably and vexatiously multiplies the proceedings in a case.   Its purpose is not compensatory. In fact, the prevailing party could be sanctioned in some cases, for bullying or harassing the losing party.

The standard of review is bad faith.  There must be some proof that the attorney intended to offer the claim for dilatory and vexatious purpose. There must also be proof that the attorney's conduct actually multiplied the proceedings.

Furthermore, the purpose of 28 U.S.C. § 1927 is to *deter* vexatious conduct by attorneys. It is not to compensate the opposing party fully for their attorney's fees, nor to impose punishment on the attorney, more than is necessary to deter unreasonably vexatious conduct.

Offending attorneys are rarely, if ever, ordered to pay full attorney's fees to the opposing party under Section 1927.

 The allegation that Fedder had been unreasonably vexatious in the case had never been raised before, not by the Addus Defendants and not by the Court, until the final three pages of Judge Herndon's last order in the case.

In effect, Judge Herndon changed the entire nature of the sanction imposed, after the argument concerning attorney's fees was already over.

If informed that Section 1927 sanctions were being considered, Fedder would have argued: that his conduct of the case was not multiplicative; that the Seventh Circuit does not consider merely filing a (meritless) claim to be an act which multiplies the proceedings; that the Seventh Circuit also does not consider merely filing a meritless claim to be sufficient to prove

bad faith; that sanctions are only imposed for the excess costs caused by vexatious conduct; and that Fedder's "vexatious" conduct (such as it was) did not truly cause the Defendants to expend nearly $100,000 in attorney's fees.

Fedder never had an opportunity to argue these matters. As a result, he never had an opportunity to make a record of those arguments at the District Court. He therefore asks this Court to recognize that he has not waived any of these arguments, just because he did not raise them below.

In addition, Courts recognize equitable issues in applying 28 U.S.C. § 1927. If given a hearing, Fedder would have taken the opportunity to show the Court that a sanction of nearly $100,000 was far in excess of what was needed to deter him, that he intends to quit practicing law if this result is sustained, and that the sanction of $92,226.17 will force him into bankruptcy.

A Judge must have discretion to control his courtroom. However, under an orderly system of justice, a Judge does not have absolute authority. Even in his own courtroom, his discretion is bound by the express terms of the statute, 28 U.S.C. § 1927. He is also bound by the Constitution of the United States.

The Fourteenth Amendment guarantees that: No state shall "deprive any person of life, liberty, or property, without due process of law."

By ordering Fedder to pay $92,226.17 in fees, Judge Herndon clearly intended to use the authority of the state to deprive Fedder of property. This triggers the requirement to provide him with due process of law.

The hallmarks of due process are notice and a hearing. Fedder had neither. Judge Herndon never once issued even an informal warning to Fedder that his conduct was becoming vexatious, or that he might be ordered to pay even a portion of Defendants' attorney's fees, if he persisted in his vexatious behavior.

In addition, when such a substantial sanction is at stake, due process certainly requires an

36

opportunity for appeal of the Court's judgment. But in order to make an appeal, under an orderly system of justice, there must first be a hearing in the trial court.

Among the arguments that Fedder would have made to Judge Herndon if given a chance are the following:

> (a) his conduct of the case was not vexatious or unreasonable;

> (b) to the extent that his conduct was considered vexatious, it did not multiply the proceedings such as to create an excess cost of $100,000;

> (c) Section 1927 is only intended to be used for deterrence, not compensation; but $100,000 far exceeds the costs necessary to deter Fedder from future vexatious conduct;

> (d) The Court should have considered Fedder's (lack of) ability to pay as a factor in determining the amount necessary for deterrence;

> (e) Because Judge Herndon's intent was to sanction Fedder for bringing this supposedly frivolous Complaint, and because this pleading did not multiply the proceedings, the proper procedure to use should have been Rule 11, not 28 U.S.C. 1927;

> (f) Judge Herndon's use of 28 U.S.C. 1927 was part of a trend to bypass the procedural safeguards of both Rule 11 and Section 1988 in civil rights cases, in violation of the express policy of Congress to seek to encourage civil rights complaints;

> (g) The proper standard of review for applying 28 U.S.C. § 1927 sanctions is bad faith, not objective unreasonableness.

To some extent, these arguments overlap with some of the arguments Fedder made on behalf of his client, but they are mostly different. The fact that Fedder was given a chance to argue against Section 1988 fees directed at Tate does not mean he was given full and fair chance to argue against Section 1927 sanctions directed at him. Herndon's decision constitutes a blatant violation of Fedder's due process rights.

If Fedder had been charged with ethical misconduct, and if his license were at risk of being suspended, he would certainly have been afforded a full and proper hearing with the Attorney Registration and Disciplinary Committee. By comparison, this result will damage his

reputation as much as any ARDC ruling could.  Yet, Fedder was given no hearing.

The Addus Defendants did serve notice that they were seeking attorney's fees under 42 U.S.C. § 1988 against Tate.  Initially, this Motion was granted by Judge Herndon. If Fedder had not asked Judge Herndon to reconsider, there would have been no futher proceedings, and Tate would have been ordered to pay fees.  Doc 130.  However, the fact that Tate was ordered to pay fees was not notice to Fedder that if he filed a Motion to Reconsider on behalf of Tate, Judge Herndon might decide to issue sanctions against Fedder instead under 28 U.S.C. § 1927.

The Addus Defendants requested the Court to authorize taking property from Tate, not Fedder.  This cannot be construed as notice to Fedder that the Court was considering taking his property instead.

Consequently, Fedder was denied his due process rights under the Fourteenth Amendment.

### D. Judge Herndon's Finding That Tate's Claims Against Addus Were Frivolous As A Matter Of Law Ignores The Exception For Good Faith Extensions Of The Law

In the District Court's Memorandum and Order granting summary judgment, the Court cites *Boyd v. Illinois State Police*, 384 F.3d 888, 898 (7th Cir. 2004). "[T]he right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the equal protection clause."   Doc 114, p(24).  This holding would render Tate's retaliation claim against Addus legally without merit, leaving only his race/nationality discrimination claim.

However, the Plaintiff-Appellant believes this is no longer good law, in light of the Supreme Court's holding in CBOCS West, Inc. *v*. Humphries 553 U.S. 442 (2008), which held that *retaliation* (due to opposing racial discrimination against a co-worker) is a form of *discrimination* (due to race) and therefore included under the prohibition against racial discrimination under 42 U.S.C. § 1981, even though the statute makes no explicit reference to retaliation.

38

Plaintiff believes that the same rule should apply to Section 1983.  Retaliation (due to opposing sex-based discrimination) is a form of discrimination (on the basis of sex) which is protected by the Equal Protection clause of the Fourteenth Amendment.

The Plaintiff has presented a more complete argument of this point in his substantive appeal.  See Case 11-3252, Plaintiff's Reply Brief pp(32-36).  Plaintiff's attorney assumes this Court will consolidate the two cases, and asks the Court to incorporate that argument into this.

### E. Judge Herndon's Finding Of Fact That Plaintiff Had No Colorable Basis For Charging Addus With Participating In The Acts Of Discrimination Is Clearly Erroneous.

In document 134, Plaintiff laid out a mosaic of concrete evidence to support his claims against the Addus Defendants.  Plaintiff identified fifteen distinct groupings of fact which implicate Addus or its agents in a conspiracy to discriminate/retaliate against him.   Doc 134, pp(9-21).  Each of these fifteen groupings of fact was thoroughly discussed in document 134 with citations to the depositions, affidavits, and exhibits in the record.   Fedder has included a copy of document 134 in the appendix to this brief.  He asks this Court to incorporate that document into the Appellate Record.

A summary of those 15 fact groupings follows:

Fact 1.  During the time when McCain (an Addus employee) was still Tate's Case Manager ("CM") in the Anna office of DRS, Tate discovered that an Addus CM from the Carbondale office, the Defendant Humphrey, was regularly using her computer to rummage through his password-protected confidential case files.  Ancell was the only one who could have given Humphrey Tate's password.  Tate knew of no reason for this at the time, since he and Humphrey shared no cases in common.  Tate does not believe that Ancell and Humphrey realized that he could see Humphrey's personal identifier when she was logged into his files.  Tate concluded that Ancell and Humphrey were acting in concert to spy on him and look for

some kind of misconduct to charge him with.  Doc 134, pp(9-10).

Facts 2-4.   Humphrey's acts of spying led directly to at least one false disciplinary charge – for nepotism – against both Tate and McCain.  Tate, who was entitled to due process, was able to disprove the charge the very day it was made.  He had the proof faxed immediately from Springfield.  However, McCain, who was an at-will employee, was fired the next day by Evans, based upon the phony and already disproved charge of nepotism.  Of course, McCain was one of the original persons who coordinated with Tate to protect Green from the sexual predations of Farmer.  One can infer that Ancell and Evans were acting together to isolate Tate and also retaliate against both McCain and Tate because they had accused Farmer of sexual harassment.   Doc 134, pp(10-13).

Fact 5.  Ironically, in a pure act of nepotism, Ancell and Evans replaced McCain as Tate's CM with Sandy Kohler, Evans' sister.  Kohler in turn cooperated with Ancell in spying on Tate.  In one instance, Kohler tried to induce one of Tate's clients to make an allegation that Tate had committed misconduct when interviewing him.  The client denied that Tate had committed misconduct.   Doc 134, pp(13-14).

Fact 6.  Tate's long-time Office Support ("OSP") Mary Sadler was also summarily fired by Evans on trumped-up charges.  She too had opposed Farmer's sexual predations, and was specifically targeted by Farmer to be fired.  Doc 134, pp(14-15); Plaintiff's Ex. 3 (Farmer's e-mail to Standerfer).

Fact 7.  Gayle Johnson applied through Addus for the vacant OSP job. She avers that Ancell offered her the job as OSP, *provided that* she (Johnson) would agree to spy on Tate. Johnson declined the job.  Doc 134, pp(15-16).

Fact 8.  Suzie Jordan then took the OSP job.  She avers that Ancell groomed her first, and

then asked her to spy on Tate.  She would not spy on him.  And she was soon fired. Doc 134, p(16).

Fact 9.  Evans' daughter Casey was then hired to fill the OSP position.  *Id.*

Facts 10-11. Even though she was merely an Addus employee, Humphrey saw herself as an active participant and part of Ancell's plans to fire Tate.  Humphrey's ex-husband and her son both averred that Humphrey told them about Tate: "He's not going to be around much longer. *We*'re making sure of that." Then she said: "He's done some bad things and he's going to pay for it. He's not going to be employed there much longer." T. Hammond ¶¶(1-10); J. Hammond ¶¶(1-10). (Emphasis added.).  In one well-documented incident, Ancell and Humphrey conspired to entrap Tate in a situation where no matter what he did, he would violate one of Ancell's directives. The hearing in which he was found "guilty" of this non-existent misconduct was a sham hearing. Doc 134, pp(16-18).

Fact 12.  Tate has sleep apnea.  He had a long-standing accommodation, worked out with a previous Supervisor, to cope with his tendency to fall asleep at afternoon meetings by having a member of his support staff sit next to him and just poke him if he started to nod off.  After his key support staff were all stripped away, he did in fact fall asleep at a meeting.  Ancell then suspended him for 15 days.  One can infer that the scheme to isolate Tate gave Ancell this opportunity for further workplace discipline.    Doc 134, p(18).

Fact 15 – Humphrey and Kohler were given "flagging rights." This was highly unethical to give an Addus employee because Addus does not merely provide an employment service to DRS; it also provides home care for DRS clients. By giving flagging rights to Humphrey and Kohler, Ancell gave them the right, without supervision, to assign Addus home care providers to each of their clients at the State's expense. Tate attests to having examined the records and

discovered that Kohler was assigning an abnormal number of Addus home care providers to her clients in Anna.  Doc 134, p(19).

With respect to Facts 10-11, there is an ambiguity which arose (for the first time) during oral argument before this Court in case 11-3252.  The affidavit of Mr. Hammond, par. 4, states: "One day my mom came over to my dad's house. . . . I believe this occurred in late Summer of 2008."  Doc 103-4 (¶4).  This tentativeness ("I believe") is not Plaintiff's attorney's normal mode of recording witness statements for an affidavit and reflects uncertainty by the affiants. They gave their statement to Fedder in 2010 more than two years after late summer 2008.

However, Tate informed Fedder about Hammond (the father only) and Fedder put Hammond (the father) on his witness list for initial disclosures to the other parties back in March, 2008.

This fact is implicitly reflected in the record.  In Document 26, filed on August 5, 2008, Fedder makes an offhand reference to his indirect knowledge of this witness.  He states: "But, Mr. Tate also has evidence (not pleaded in the Complaint because all facts need not be pleaded) to show that members of the Addus Group talked about having him fired as well."   Doc 26, pp(2-3).  Fedder had not even talked to Tate in the two months preceding the filing of this Brief. Therefore, it could not have been late summer 2008, and must have been summer 2007 when Humphrey made her statement.

## VII. CONCLUSION

WHEREFORE, Appellant Fedder respectfully requests that this Court vacate the Order of Judge Herndon requiring Fedder to pay attorneys' fees for the Addus Defendants.


Respectfully Submitted,
s/Richard Fedder

42

## CERTIFICATE OF COMPLIANCE

This brief complies with the following type-volume limitation of Fed. R. App. P. 32(a)(7)B because:

This brief contains 13,981 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief has been prepared in a proportionally spaced typeface using Corel Word Perfect 10 in 12-point Times New. Roman typeface.


s/Richard Fedder

_____
Attorney for Plaintiff


Dated: September 25, 2012

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2012, I electronically filed the above Plaintiff's Appeal Brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I further certify that on December 7, 2011, I sent two hard copies of Plaintiff's Appeal Brief to each of the attorneys listed below by placing them in the U.S. mail and addressing them as indicated below:

Mary E. Welsh
Office of the Attorney General
Civil Appeals Division
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-2106

Carmen N. Couden
Bernard Bobber
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, Wi. 53202-5306
414-271-2400
414-297-4900 (fax)
ccouden@foley.com
bbobber@foley.com

Respectfully Submitted,

_____
Richard Fedder
(attorney for Plaintiff-Appellant)

# APPENDIX

## <u>Table of Contents of Appendix Containing Order Under Review</u>

<u>Document</u>                                                                              <u>Page Number</u>

Memorandum and Order (sanctioning attorney Fedder) (Doc. 150) ........................................ A-1

Motion to Reconsider Award of Attorney's Fees to Addus (Doc 134) .................................... A-2

<u>Circuit Rule 30 (d) Statement</u>: All of the materials required by Circuit Rule 30 (a), are included in this Appendix.

_____
s/Richard Fedder

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**EDGAR TATE,**

**Plaintiff,**

**v.**

**JO GULLEY ANCELL,**
**et al.,**

**Defendants.**                                           **No. 08-0200-DRH**

### MEMORANDUM and ORDER

**HERNDON, Chief Judge:**

### I. Introduction

Pending before the Court is the Addus defendants' motion and amended petition for attorney's fees and costs (Docs. 135 & 147). According to the fee petitions, the Addus defendants move the Court to award them fees totaling $92,226.17. Having considered the petitions, submissions and applicable law, the Court grants the requested fees and costs.[1]

The Addus defendants seek $79,838.00 in attorneys' fees; $5,213.00 in paraprofessional fees; and $7,175.17 in expenses. In response, plaintiff still disagrees with the Court's conclusion that the Addus defendants are entitled to fees;

---

[1]On February 13, 2012, the Court determined that the Addus defendants were prevailing parties entitled to fees and costs (Doc. 130). Thereafter, the Addus defendants filed the petition for attorney's fees and costs. After reviewing the petition, the Court determined that additional information was needed. The Addus defendants supplied such information in the amended petition for attorney's fees and costs. Thus, the Court only needs to calculate the reasonable amount of fees and costs to award the Addus defendants.

maintains that the out of the three groups of defendants, the Addus defendants

clearly played a lesser role in the conspiracy and argues that it is unconscionable for

the Addus defendants to have incurred nearly $100,000 worth of legal bills to prove

to the Court that his claims were "*facially* frivolous."  The Court notes that plaintiff

did not object specifically to the reasonableness of the billing hours or to the

reasonableness of the rates submitted by the Addus defendants.  Plaintiff generally

objects to the total amount as excessive and punitive in nature.  Plaintiff asks the

Court to award the Addus defendants no more than $25,000 in legal fees.

## II.  Attorney's Fees

When a prevailing party is entitled to "a reasonable attorney's fee," *see, e.g.,*

42 U.S.C. § 1988;, the district court must make that assessment, at least initially,

based on a calculation of the "lodestar"—the hours reasonably expended multiplied

by the reasonable hourly rate—and nothing else. *See Pickett v. Sheridan Health

Care,* 664 F.3d 632, 640–43 (7th Cir. 2011). In limited circumstances, once

calculated, the lodestar amount may be adjusted. *See Perdue v. Kenny A. ex rel.

Winn,* ⸻ U.S. ⸻, 130 S.Ct. 1662, 1673–74, 176 L.Ed.2d 494 (2010); *Hensley v.

Eckerhart,* 461 U.S 424, 430, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Robinson

v. City of Harvey,* 489 F.3d 864, 871–72 (7th Cir. 2007).

In setting a reasonable billing rate, courts are directed to consider the

attorney's regular rates as well as the rate "prevailing in the community for similar

services by lawyers of reasonably comparable skill, experience, and reputation."

*Blum v. Stenson,* 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

Evidence of reasonableness of a proposed hourly rate must include an affidavit or declaration of the attorney performing the work and information about rates actually billed and paid in similar lawsuits. *Id.* at 896, 104 S.Ct. 1541. Appropriate rates can be determined through direct or opinion evidence about what local attorneys charge under similar circumstances. *Id.* at 896 n. 11, 104 S.Ct. 1541.

Once the lodestar figure is determined, the court may adjust the figure upward or downward as necessary to make the award of attorney's fees reasonable, while ensuring the fee award does not provide a windfall to the movant. *See Hensley*, 461 U.S. at 429, 103 S.Ct. 1933. Although courts have "broad discretion in setting the appropriate award of attorney's fees," there is a strong presumption that the lodestar amount is reasonable and should be modified only in exceptional cases. *City of Burlington v. Dague*, 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992).

In order to determine a reasonable hourly rate, courts should look at the "the market rate for the services rendered." *Pickett*, 664 F.3d at 640. The market rate is the "rate that lawyers of similar ability and experience in their community normally charge their paying clients for the type of work in question." *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 555 (7th Cir. 1999). The attorney's billing rate for comparable work is "presumptively appropriate" to use as the market rate. *Pickett*, 664 F.3d at 640; *Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003). "The best evidence of the value of the lawyer's services is what the client agreed to pay him." *Assess. Tech. of WI, LLC v. WIREdata, Inc.*, 361 F.3d 434, 438 (7th Cir. 2004). Thus, the attorney's actual billing rate paid by his client is "presumptively

appropriate" to use as the market rate. *People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1311 (7th Cir. 1996). The "next best evidence" of a reasonable market rate is "evidence of rates similarly experienced attorneys in the community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases." *Id.* (quoting *Spegon,* 175 F.3d at 555). The party seeking fees bears the burden of "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community." *Id.* (quoting *Blum v. Stenson,* 465 U.S. 886, 895 n. 11 (1984)). Once the fee applicant satisfies this burden, the other party must provide "a good reason why a lower rate is essential." *Id.* (quoting *People Who Care,* 90 F.3d at 1313).

In its fee petitions, the Addus defendants list seven attorneys, one  paralegal and a law librarian who worked on this case.  The attorneys listed have many years of experience.  The lead partner on the case has 25 years of experience and the primary attorney on the case has seven to eight years of experience in employment litigation.  The hourly billing rates for the attorneys range from $210.00 to $444.26 an hour.  The attorneys' fees total $79,838.00.  The paralegal's rate is $185.17 an hour and the law librarian's rate is $84.44 an hour and their fees total is $5,213.  The Addus defendants also seek $7,175.17 in expenses: electronic legal research - $5,439.12; travel and meals - $1,682.50; and mailing and filings $53.55.

Based on the documentation submitted, the Addus defendants have established to this Court's satisfaction that the hourly rates submitted by its legal team are the actual billing rates and are reasonable for this type of employment

discrimination case.  These rates were fully paid by the Addus defendants with no
guarantee of repayment and are thus presumptively appropriate to use as the market
rate.  As noted previously, plaintiff does not challenge the hourly rates of any of the
Addus defendants' attorneys.   Given the experience and expertise of the Addus
defendants' lawyers the Court finds the rates for the attorneys, the paralegal and the
law librarian to be entirely reasonably.  Accordingly, the Court will award the Addus
defendants its fees at these rates and moves on to the remaining issue of whether the
time expended was reasonable.

Plaintiff made general arguments about the fees and only a couple of specific
objections to the hours expended.  By virtue of its familiarity with the litigation, the
Court is in the best position to determine the number of hours reasonably expended
in the litigation.  *Uphoff v. Elegant Bath, Ltd.,* 176 F.3d 399, 409 (7th Cir. 1999);
*McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 519 (7th Cir. 1993). The Court
should exclude from the fee petition time spent that was "excessive, redundant, or
otherwise unnecessary." *Stark v. PPM Am., Inc.,* 354 F.3d 666, 674 (7th Cir. 2004).

As to plaintiff's specific objections, the Court finds them without merit.  First,
plaintiff objects to 6 hours (5.9 hours by the Court's calculation) of professional
services to investigate plaintiff's counsel and the judge as these are not part of the
legal requirements of the case.[2]  The Court disagrees. All lawyers worth their salt do
research to see how the Court has ruled on cases of similar ilk.  As for the research

---

[2]A review of the entries indicates that the Addus defendants' counsel also investigated
plaintiff which counsel failed to mention.

on the plaintiff's lawyer, it makes sense to the Court that defendants would need to research the oppositions as well. If plaintiff's lawyer did not do that on behalf of his client, then he did not provide a full service to his client. Thus, the Court finds these to be appropriate billable hours.

Likewise, the Court rejects plaintiff's objections to the sum of $25,435 billed to the client to prepare the motion to dismiss and the $4,053 legal research billed to the client to prepare the motion to dismiss. Based on the reasons stated below and the following, the Court finds these hours and the legal research appropriate. The Court cannot second guess how much time defendants should have spent on the motion to dismiss. Unfortunately, plaintiff pursued a very convoluted theory and it made the case very complicated. It is clear plaintiff's counsel did not fully understand the facts and the law well, or he did and he just attempted to twist a cause of action out of something that was not there in order to provoke a settlement. In any event, the pleadings dictate the course of action either side has to take and the plaintiff is primarily responsible for the huge amount of time spent by the defense in trying to defend the this case.

As to plaintiff's objection to the 1.2 hours for an entry of appearance, the Court finds this to be reasonable. Perhaps an hour and two tenths is a long time to prepare an entry of appearance. However, the Court finds that it may take that long to prepare and file the entry considering that the associate or assistant must get the out the file or bring it up on the computer, check the local rules, check the chamber procedures, check the Federal Rules of Civil Procedure and dictate or type the entry

and check the CM/ECF procedures all before preparing and filing the entry.  Thus, the Court rejects this objection.

Lastly, plaintiff objects to the billing of 1 hour to confer with plaintiff's counsel about staying discovery pending ruling on the motion to dismiss.  Plaintiff contends that this conversation took 5 to 10 minutes.  Unfortunately plaintiff's counsel does not identify the date because the Court does not know if the billing was accompanied by another conversation in house.   Thus, the Court finds that this billing is reasonable.

Further, plaintiff argues strongly that the Court should have dismissed the case at the dismissal stage if the Court thought that the case was frivolous at that time.  This logic is severely flawed.  As to when the case became frivolous, the Court finds as follows.

The allegations contained in the original complaint against the Addus defendant are summarized as follows:

> Addus is a private corporation based in Marion, Illinois that provides private support staff, by contract, to the DRS offices in Carbondale and Anna.  Kim Evans was the branch manager at the Addus Marion office.  Lorie Humphrey is employed by Addus as a contract worker in the DRS Anna office.  Contract workers hired by Evans were requested by Ancell or Evans to inform on Tate and look for opportunities to charge him with misconduct.  Ancell assigned Humphrey to work closely with Tate in reassessing HSP customers and that Ancell and Humphrey conspired to make false charges against Tate so that he would be subject to discipline. Ancell hired contract workers from Addus in violation of the DRS rules against nepotism in that Ancell hired Evan's sister, Sandy Kohler and her daughter Kasey Evans.  In January 2007, Tate wrote a letter to the Executive Office of the Inspector General claiming that the hiring of Evan's relatives was unlawful. Defendants' actions (discipline, suspension and harassment) against him were because he had sleep

apnea, his is Hispanic and he spoke out about the sexual harassment
and the nepotism.

Pursuant to clearly established case law and the Federal Rules of Civil Procedure, the

Court, in deciding a motion to dismiss for failure to state a claim, has to take the

case as plead, assume the facts as stated by plaintiff in the complaint as true and

draw all reasonable inferences in plaintiff's favor. The Court did just that in ruling

on the motion to dismiss. This was plaintiff's complaint and his counsel alleged facts

in the complaint which the Court took as true. In deciding the motion to dismiss, the

Court did parcel out some of plaintiff's claims that were not legally cognizable. Some

of the counts were dismissed as plaintiff's counsel should not have brought these

claims against the Addus defendants or were dismissed as plaintiff's counsel

conceded that he did not intend to bring these claims against the Addus defendants.[3]

Plaintiff's original complaint was a huge ball of confusion in that plaintiff commingled

various claims against the numerous defendants he sued. This made the task of

going through and determining which claims stated a valid claim for relief a daunting

---

[3]For example, as to the ADA and Title VII claims against the Addus defendants, plaintiff
responded: "Plaintiff acknowledges that he has not stated and in fact, never intended to state a
claim against the Addus Group for violations of Title VII or the ADA. Such claims may be filed only
against DRS as an institution. Furthermore, plaintiff has determined, through additional research,
that he does not have a legal basis at this time to make a claim for common law retaliation, under
Illinois law, and here hereby requests the Court to withdraw that Count of his Complaint without
prejudice." (Doc. 26. p. 6). Further, as to the First Amendment claims regarding nepotism,
plaintiff conceded this claim in his response: "The Plaintiff recognizes, as Addus has duly pointed
out, that he partially mis-perceived the time sequence of events when he told the story in his
Complaint. In particular, given the timing of the filing of Tate's first *written* complaint against
Addus about nepotism in hiring, it is unlikely that this was a substantial motive for the Addus
Group in taking actions against Mr. Tate, since most of the acts against Mr. Tate occurred *before*
Mr. Tate filed his formal, written complaint." (Doc. 26, p. 4).

task for the Court.[4]

Thereafter, at the summary judgment stage while combing through approximately 1000 plus pages of pleadings and exhibits, the Court found out that plaintiff's wild accusations could not hold water.  After considering all the evidence contained in the record, the Court found out the plaintiff could not confirm the allegations that he alleged in his complaint.  The Court found:

> (1) "[t]here is no evidence that Addus, Evans or Humphrey took any adverse actions against Tate.  The Addus defendants did not terminate him, suspend him, or discipline him.  Nor did the Addus defendants reduce his compensation or employment benefits or alter his job responsibilities;"
> (1) "[t]here is no evidence that Addus, Evans or Humphrey took any adverse actions against Tate.  The Addus defendants did not terminate him, suspend him, or discipline him.  Nor did the Addus defendants reduce his compensation or employment benefits or alter his job responsibilities;"
> (2) "[w]hen asked about the alleged conspiracy, Tate repeatedly testified that he had no personal knowledge of when, where or how the conspiracy was formed, or whether he knew if the defendants had ever communicated at all regarding a plan to punish plaintiff;"
> (3) Plaintiff's § 1981 § 1983 retaliation claims "fails as a matter of law," because he did not alleged that he was retaliated against on the basis of his race; and
> (4) Plaintiff "has no direct evidence, nor does the record establish that any of the alleged actions ... were taken against him because he is Hispanic.  Tate admits that the has no proof of any conspiracy between DRS and Addus.  Further, he has no proof ... anyone took any actions against him based on race."

(Doc. 26. ps. 22-26).  Also at this time, the Court determined that the case plaintiff's

---

[4]In that lengthy Order, the Court directed plaintiff to designate and divide the remaining claims as to each separate defendant into separate counts.  A review of the first amended complaint and the second amended complaint (Docs. 34 & 63), reveal that plaintiff's counsel did not comply with that directive.

counsel filed on behalf of his client as to the Addus defendants was made up of many
misrepresentations and was absolutely frivolous from the beginning of the case.  The
case against the Addus defendants should have never been brought and had
plaintiff's counsel done his homework before hand these claims would not have been
brought.  Thus, the Court finds that plaintiff should not have to shoulder this hefty
bill based on his lawyer's malfeasance for filing and pursuing such a frivolous case
against defendants who did not belong in this case.

District Courts possess the authority to require an attorney to pay their
opponent's attorney's fees under certain circumstances.  *See* 28 U.S.C. 1927.
Section 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of
> the United States or any Territory thereof who so multiples the
> proceedings in any case unreasonably and vexatiously may be required
> by the court to satisfy personally the excess costs, expenses, and
> attorneys' fees reasonably incurred because of such conduct.

Liability under § 1927 is justified only in those limited situations when an attorney's
conduct is marked by either subjective or objective bad faith.  *Pacific Dunlop
Holdings v. Barosh*, 22 F.3d 113, 120 (7th Cir. 1994).  The Seventh Circuit has
concluded that it is appropriate (1) in "instances of a serious and studied disregard
for the orderly process of justice," *Ross v. City of Waukegan*, 5 F.3d 1084, 1089 n.
6 (7th Cir. 1993), (2) when an attorney pursues a path that a reasonably careful
attorney would have known, after appropriate inquiry, to be unsound," *Kapco Mfg.
Co., Inc. v. C & O Enters, Inc.*, 886 F.2d 1485, 1491 (7th Cir. 1989)(citation omitted)
, and/or (3) "where a 'claim [is] without a plausible legal or factual basis and lacking

in justification.'" *Burda v. M Ecker Co.*, 2 F.3d 769, 777 (7th Cir. 1993)(citations omitted); *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985)(holding that "[i]f a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious."). The statute also imposes on an attorney a duty "to dismiss claims that are no longer viable." *Dahnke v. Teamsters Local 695*, 906 F.2d 1192, 1201 n. 6 (7th Cir. 1990). Clearly, attorney Fedder's conduct in this litigation as to the Addus defendants has been unreasonable and vexatious. Therefore, based on the circumstances of this litigation against the Addus defendants, the Court **ORDERS** that attorney Richad Fedder shall pay the attorneys' fees and costs pursuant to 28 U.S.C. 1927.

### III.  Conclusion

Accordingly, the Court **GRANTS** the Addus defendants' motion and amended petition for attorney's fees and costs (Docs. 135 & 147). The Court **AWARDS** the Addus defendants $92,226.17 in attorneys' fees and costs. This award shall be paid by attorney Richard Fedder.

**IT IS SO ORDERED**.

Signed this 28th day of June, 2012.

Digitally signed by
David R. Herndon
Date: 2012.06.28
09:21:29 -05'00'

**Chief Judge**
**United States District Court**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

EDGAR TATE,                                )
                                           )
          Plaintiff,              )
                                           )
      -vs-                          )      No. 08-200-DRH
                                           )
JO GULLEY ANCELL, et al.;                  )
                                           )
          Defendants.             )

## MOTION TO RECONSIDER THE AWARD OF ATTORNEY'S FEES TO ADDUS

       NOW COMES the Plaintiff, Edgar Tate, by his attorney, Richard Fedder, and asks the

Court to Reconsider its Award Of Attorney's Fees to the Addus Group of Defendants.

### I. INTRODUCTION

      The Plaintiff asks the Court to Reconsider for each of the following reasons:

**1**

      It is premature for this Court to award attorney's fees to the Addus Defendants at this time.

The very reasons offered by this Court – being the conclusions of "fact" issued in its Summary

Judgment Order and then reiterated in its Order granting attorney's fees (Doc 114, 130) – are the

same key factual matters being disputed by the Plaintiff in his *appeal* of this Court's Summary

Judgment Order.   Specifically, the Plaintiff contends on appeal that this Court erred by taking its

"facts" directly from the Defendants' Summary Judgment Brief (as if they were undisputed), and

failing to consider or even acknowledge the evidence presented by the Plaintiff in opposition to

that version of the facts.   Given that Plaintiff's appeal was filed prior to Addus' Motion for

attorney's fees, the Appellate Court would seem to have jurisdiction to resolve these issues.

      This Court may, perhaps, be justified in considering a Bill of Costs even after jurisdiction

passes to the Appellate Court.   But if so, that is because the factual basis for determining costs is

ancillary to the appeal.   However, the so-called "facts" which underlie the Court's finding that

Defendants are entitled to attorney's fees are precisely what the Plaintiff is appealing.

The standard of review for granting summary judgment is whether, taking *all of the facts* in

the light most favorable to the Plaintiff, a reasonable fact-finder could find that the Addus

Defendants are liable.   The standard of review for awarding attorney's fees is whether or not the

Plaintiff's factual claims against the Addus Defendants were "groundless" and "unreasonable".

If the Appellate Court reverses this Court's decision on summary judgment, it would then become

logically and legally impossible for this Court to hold that Plaintiff's claims were "groundless."

This is so, even if the Addus Defendants ultimately win their case-in-chief at trial.   But the same

cannot be said about a Bill of Costs, which will become valid if the Defendants win their

case-in-chief, regardless of how this appeal turns out.   That is why this Court's decision on a Bill

of Costs may fall within discretionary bounds, but its decision on attorney's fees is premature.

**2**

In granting summary judgment, this Court inexplicably neglected to consider any of the

evidence that the Plaintiff presented in Response to the Addus Group's Summary Judgment

Motion.   The Plaintiff presented an abundance of evidence (to be discussed in more detail below)

showing that the Addus Defendants knowingly (and apparently for their own profit) coordinated

and acted in concert with the DRS Defendants in a plan to isolate, harass, discipline, and ultimately

fire Mr. Tate.   But this Court failed to mention any of that evidence in its Memorandum and Order

granting Summary Judgment.   Rule 56 requires an explanation from the Court why it did not

consider this evidence sufficient, but the Court never gave one.

For example, the Plaintiff presented evidence in the form of affidavits from two witnesses

that the Defendant Humphrey stated about Mr. Tate: "He's not going to be around much longer.

*We're* making sure of that," and "He's done some bad things and he's going to pay for it.   He's not

going to be employed there much longer."   T. Hammond ¶¶(1-10); J. Hammond ¶¶(1-10).

(Emphasis added.).   As an Addus employee, Ms. Humphrey obviously had no control over

employment decisions.   But to say: "he's not going to be employed much longer" clearly

indicates she knew of a plan or intention by the DRS Defendants to have Mr. Tate fired.   By using

"we" Ms. Humphrey implied she was playing an active part in implementing that plan.

It seems to the Plaintiff that this admission by Ms. Humphrey is sufficient "grounds", all by

itself, for alleging that the Addus and DRS Defendants were working together to get him fired.

But the Plaintiff did not rely on this fact alone.   This was only one of many facts (or more

precisely, clusters of facts) which formed the basis for the Plaintiff's allegations that the Addus

Defendants knowingly participated in a coordinated effort to harass, intimidate, discipline, and

ultimately fire Mr. Tate.   The Plaintiff has reiterated a number of those key facts below – with

citations to the evidentiary Record.   With those facts in mind, the Plaintiff does not understand

how this Court could find that he had no grounds for his claim against the Addus Defendants.

**3**

The fact that Plaintiff's attorney did not answer the Defendants' Motion for attorney's fees

does not constitute a waiver of any of his defenses, since the question the Court addressed was

whether the Plaintiff did or did not have grounds to make a claim against the Addus Defendants.

The Plaintiff's answer to that question is based solely upon his Complaint, and the documents and

evidence already presented to the Court in Response to the Motion for Summary Judgment, which

corroborate that Plaintiff did have grounds for his factual allegations.

**4**

Nevertheless, the Plaintiff's attorney apologizes to this Court for not answering the Motion earlier, and asks this Court to accept this Memorandum now as his belated answer.   The Plaintiff's attorney's mother had a cerebral hemorrhage (roughly equivalent to a stroke) back in September of 2011.   The Plaintiff's attorney's mother lives in Baltimore and the Plaintiff's attorney spent much time at the Hospital in Baltimore after her stroke.   He was aware of the three Motions for Bills of Cost, filed by the three groups of Defendants, and did not oppose them.   But he thought that was the end of it.   He never even saw the Addus Defendants' separate Motion for Attorney's fees.   Of course, the Addus Defendants did not file this Motion until after the Plaintiff's attorney filed his appeal and the Appellate Court took jurisdiction of the case, so Plaintiff's attorney was not actively looking for such a Motion.   He was in Baltimore at the time and (understandably) distracted by personal matters.   Still, the Plaintiff's attorney acknowledges error on his part.   He now asks this Court to act equitably in allowing him to file his opposition to the Motion at this time.

## II. PLAINTIFF'S COMPLAINT AGAINST THE ADDUS GROUP WAS NOT FRIVOLOUS, UNREASONABLE, OR GROUNDLESS

42 U.S.C. § 1988(b) grants attorney's fees to a prevailing plaintiff as a matter of course.   It was intended to "make it easier for a [civil rights] plaintiff of limited means to bring a meritorious suit." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 420 (1978)).   "The plaintiff is the chosen instrument of Congress to vindicate "a policy that Congress considered of the highest priority."   *Id*. (citing *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968))

42 U.S.C. § 1988(b) was never intended to be used by defendants as a club – to discourage civil rights plaintiffs from daring to file a Complaint, for fear that they might fail to document their factual allegations to the Court's satisfaction, and face financial ruin as a result.

In the first place, the policy is to encourage (reasonable) civil rights lawsuits, not to discourage them.   In the second place, when a district court awards counsel fees to a prevailing

plaintiff, it is awarding them against a violator of an important federal law. The same cannot be said for a prevailing defendant. *Christiansburg Garment Co.* 434 U.S. at 418.

Although the language of 42 U.S.C. § 1988(b) says the prevailing *party* may receive attorney's fees, the *Christianburg Garment* Court cited legislative history to conclude that Congress only intended to award fees to a prevailing defendant in exceptional cases: "to deter the bringing of lawsuits without foundation," or "to discourage frivolous suits." *Id.* at 420 (citing the Senate floor discussions of the almost identical attorney's fee provision in Title II).

The Court concluded: "A plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless." *Id.* at 422.

The issue, as laid out by the *Christiansberg Garment* Court, is whether the "claim" (*i.e.* the Complaint) was "frivolous, unreasonable, or groundless" *at the outset*, not whether the proof of the claim fell substantially short of the mark. In other words, the rule permitting the award of attorney's fees to civil rights defendants only seeks to discourage a plaintiff from basing a civil rights complaint upon a legal theory which is frivolous (in light of established law), or upon factual claims which are "groundless," in the sense that the plaintiff had no reason to believe they were true at the time the Complaint was filed. *Id.* at 420.

When a court rules against the plaintiff on a summary judgment motion, that ruling signifies the Court's belief that the plaintiff has failed to present sufficient concrete evidence to persuade any reasonable person that his factual allegations are true. Summary judgment is not granted lightly. It necessarily means that the Court thinks the Plaintiff has made a very weak case.

But that is still not sufficient grounds to award attorney's fees to the defendant. If it were, the courts would have to award attorney's fees to civil rights defendants in every case for which summary judgment is granted. That would render civil rights law much harsher on plaintiffs than

other civil law, and would certainly be contrary to public policy and the intent of Congress.

     Indeed, the *Christianburg Garment* Court explicitly warned:

> In applying these criteria, it is important that a district court resist the
> understandable temptation to engage in *post hoc* reasoning by concluding that,
> because a plaintiff did not ultimately prevail, his action must have been
> unreasonable or without foundation. This kind of hindsight logic could discourage
> all but the most airtight claims, for seldom can a prospective plaintiff be sure of
> ultimate success. No matter how honest one's belief that he has been the victim of
> discrimination, no matter how meritorious one's claim may appear *at the outset*, the
> course of litigation is rarely predictable. Decisive facts may not emerge until
> discovery or trial. The law may change or clarify in the midst of litigation. Even
> when the law or the facts appear questionable or unfavorable at the outset, a party
> may have an entirely *reasonable ground for bringing suit*.

*Id.* at 421-2 (Emphasis added).

     Hindsight is 20-20.   The Court should not base its decision to award attorney's fees upon
the Defendants' Motions for Summary Judgment, or even on the Court's own independent
findings of "fact", as inferred from the Motions for Summary Judgment and the Response thereto,
because those "facts" were necessarily informed by and predicated upon discovery information,
not known to the Plaintiff "at the outset" when he filed his Complaint.   Instead, the Court's
inquiry into attorney's fees must focus upon the Plaintiff's Complaint itself, and the facts as
reasonably understood by him at the time of filing his Complaint, *before* discovery.

     The gist of that Complaint (Doc 2, as superseded by Doc 63) is that Plaintiff's secretary
was being sexually harassed (and repeatedly propositioned) by her supervisor.   The Plaintiff
intervened to protect his secretary.   He alleges that: in so doing, he incurred the wrath of DRS
Management, who (collectively) branded him as a troublemaker and retaliated against him.   He
also alleges that Management scapegoated him due to racial prejudice, blaming him for being
disrespectful and insubordinate, in part merely because he is Hispanic; rather than blaming his
supervisor for being a sexual predator.   As a result, according to Plaintiff, a plan was formulated

to harass him, isolate him in the work place, spy on him, trump-up phony misconduct allegations against him, and repeatedly suspend him; with the ultimate goal of getting him fired.   (A vested State employee like Mr. Tate is not easy to fire.   Generally, this requires progressive discipline, via a series of suspensions for misconduct, before firing.   And that is why the harassment of the Plaintiff went on for years, involving a number of particular incidents. Tate Aff. ¶¶ 36-44, 114-5).

A complaint of this nature is obviously not frivolous in theory.   Nor can it be considered "groundless", if the facts asserted by the Plaintiff were either: (a) directly observed by him; or (b) learned by him from information provided by others which he genuinely believed to be true.

There are, of course, many complications to the Plaintiff's theory, such as timeliness and proximate cause during several years of harassment.   But the most important complication in terms of this inquiry is: How were the Addus Defendants implicated in this scheme?

Obviously, Addus is a private company, having no authority over Plaintiff's workplace, or the disciplinary decisions made against him.   But Addus was certainly in a position to contribute to a *co-worker* hostile environment because Addus provided a couple of key assistants to Mr. Tate in the Anna DRS office.   Moreover, according to Plaintiff's allegations, Addus (or its agents) were intimately involved at nearly every stage in the *supervisory harassment* of Mr. Tate, and the disciplinary actions taken against him.   Addus was either a co-conspirator in these actions, or else a knowing participant and agent who willfully coordinated its actions with DRS Management.

To summarize the charges relating to Addus (with a more detailed description to follow):

> 1. Two of Mr. Tate's long-time trusted assistants in the Anna office of DRS were Addus employees.   The Plaintiff alleges that they were both fired by the regional Addus Director, the Defendant Kim Evans, based upon sham or trumped-up charges.   Ms. Evans did this in close consultation with the Plaintiff's supervisor at the time, the Defendant Ms. Ancell.

> 2. These co-workers were ultimately replaced by Ms. Evans' sister, Sandy Kohler, and her daughter, Casey Evans – in violation of Illinois nepotism

rules.

3. The Addus employees in both the Carbondale and the Anna office of
DRS began spying on Plaintiff and seeking to dig up dirt against him for the
purpose of having him disciplined for misconduct.

4. The Addus employee who took the lead in these matters, the Defendant
Humphrey, even admitted that she was part of a plan to get Mr. Tate fired.

5. In one incident, Ms. Humphrey deliberately set Mr. Tate up, and lied
(apparently in concert with Ms. Ancell) in order to get Mr. Tate suspended.

6. Addus (as a company) had motive to support Ms. Ancell in her attempt to
retaliate and discriminate against the Plaintiff.   Specifically, Addus
profited from a *quid-pro-quo* with Ms. Ancell because the Addus Case
Managers (Ms. Humphrey and Ms. Kohler, who is Ms. Evans' sister) both
were given a free hand (known as "flagging rights") to assign Addus
personal assistants as care providers to their clients (of which some 50% of
the revenue went directly to Addus at the State's expense).   Ms. Humphrey
and Ms. Kohler, in fact, took advantage of their free hand to assign Addus
care providers in far greater numbers than was done by the other State
employees, such as Mr. Tate.

7. Ms. Evans personally benefitted from this *quid-pro-quo* as well, because
it enabled her to find jobs for her sister and her daughter.   This was a
violation of State nepotism rules, which Ms. Ancell conveniently ignored.

The Plaintiff understands that he has never alleged that the Addus Defendants were

personally motivated by either retaliation or race.   But Plaintiff's legal theory was that the DRS

Defendants were so motivated, and the Addus Defendants either conspired with the DRS

Defendants or willingly made themselves agents in implementing DRS plans to retaliate and

discriminate against Plaintiff.   (See Plaintiff's Complaint (Doc 2), or as revised (Doc 63) for his

full factual allegations, and Doc 34 (pp. 2-4) for those allegations explicitly noted by the Court.).

The Court cannot now (at this late stage, and after much money was expended on discovery

and Summary Judgment Motions) claim that Plaintiff's *legal theory* was *frivolous*, given that the

Court previously ruled, in response to the Addus Defendants' Motion to Dismiss that Plaintiff's

legal theory for liability against Addus was sound, if his factual allegations can be proved. Doc 34,

pp 8-9 (Section 1981), pp 9-11 (Section 1983 and Statute of Limitations), pp 11-12 (color of law).

That puts the question squarely on the factual allegations. But, again, the forward-looking statement: *if the Plaintiff can prove his factual allegations* may be the right standard for summary judgment or trial, but it is not the right standard for awarding attorney's fees. The proper question for awarding attorney's fees is whether the Plaintiff had genuine grounds, based upon direct knowledge, or upon information provided to him by other witnesses, to reasonably believe he could prove these factual allegations against Addus, at the time he filed his Complaint.

Of course, the Court could use Plaintiff's Summary Judgement Response to infer that he never had any basis for his factual allegations in the first place – for example, if no attempt was made to provide witnesses or documentation in support of his factual claims. However, precisely the opposite is true. The Plaintiff presented hundreds of pages of witness testimony in the form of affidavits – from himself, his colleagues, other supervisors, and clients – as well as deposition testimony from the Defendants, and approximately 20 exhibits. A significant portion of this evidence addressed the role of the Addus Defendants in the case. Indeed, Plaintiff contends that he provided concrete evidence in support of each and every fact alleged in his Complaint.

None of the Plaintiff's evidence has been objected to by the Defendants, or struck by the Court. Besides, even if it had been objected to, that is one of the eventualities of litigation that the Plaintiff should not be expected to anticipate at the outset, when he framed his Complaint.

Admittedly, much of the Plaintiff's evidence is circumstantial. Conspiracies are by their nature secretive. The victim is rarely privy to the planning conversations of the conspirators. That is why Courts have held that a conspiratorial agreement may be inferred from circumstantial evidence. *Hernandez v. Joliet Police Dept.*, 197 F.3d 256, 263 (7th Cir. 1999).

But in this case, and as already noted, the Plaintiff has even presented direct evidence in the

form of statements made by one of the Addus conspirators to the effect that "we're" going to get

Mr. Tate fired.

The Plaintiff cannot possibly review all of the evidence affecting Addus, which he

submitted to the Court.   But the highlights of that evidence (with reasonable inferences) follow:

1.   Throughout the events in question, the Defendant Humphrey was an Addus employee

in the Carbondale office of DRS, where she worked under the joint supervision of Ms. Ancell from

DRS and Ms. Evans from Addus.   Ancell Dep. at 64; Tate Aff. ¶(188-9); Finn Aff. ¶(54).

As this Court knows, the Plaintiff has alleged that Ms. Humphrey was assigned to spy on

him.   The Defendants insisted in their Summary Judgment Motion that Ms. Humphrey was

merely assigned to assist Mr. Tate. This Court duly adopted the Defendants' factual allegation as

true.   But it is not true, as Plaintiff explained in his Response to Defendants' Motion.

Ms. Humphrey was not assigned to assist Mr. Tate at all, during the time when Robert

McCain was his assistant.   Tate Aff. ¶¶(157-60, 253-4); Humphrey Dep at 48.   Mr. McCain, an

Addus employee, was Mr. Tate's long-time assistant and Case Manager ("CM") at the Anna office

of DRS.   McCain Aff. ¶¶ 2-6, 19-20.   It was only *after* Mr. McCain was fired that Ms. Humphrey

was first assigned to help Mr. Tate with a few of the Anna cases. Tate Aff. ¶¶(157-160, 253-4);

Humphrey Dep at 48.   Even then, Mr. Tate alleges that this "help" was not necessary; and he did

not ask for it.   Tate Aff. ¶¶(119-121, 157-160, 254).   The "assistance" seemed to be a

contrivance, designed to set him up for bogus disciplinary action. (See # 11 below for a description

of this disciplinary action.)

In any event, long *before* Mr. McCain was fired, and *before* Ms. Humphrey was ever

assigned to assist him with anything, Mr. Tate began noticing that Ms. Humphrey was examining

the case files of the Anna clients from her computer in Carbondale. McCain Aff ¶¶(55-59); Tate

Aff ¶¶(141-158); Finn Aff ¶¶ (6, 15-16, 22, 35-45). This occurred frequently, dozens or perhaps

even hundreds of times.   *Id.*   Mr. Tate knew this because a message would appear on his

computer screen that Ms. Humphrey was logged into his files.   *Id.*

     Mr. Tate avers that there was no legitimate work-related reason for this.   Anna and

Carbondale are completely different regions, with no clients in common.   McCain Aff. ¶(56-7);

Tate Aff ¶(143-156).   Nor did Ms. Humphrey give Mr. Tate any actual suggestions or assistance,

after examining his files.   Tate Aff ¶(158).   One can infer therefore that the Defendants' claim

that Ms. Humphrey was merely assisting Mr. Tate with his case load at this time (Tate Aff ¶

157-158) was a pretext, to cover up the fact that she was really spying on him.

     Case files for each individual Counselor (such as Tate) or CM (such as McCain) are

confidential, *to protect the clients*. McCain Aff ¶¶(55-59); Tate Aff ¶¶(141-158); Finn Aff ¶¶ (6,

15-16, 22, 35-45). Each Counselor or CM has his own password. *Id.* These passwords are known

only to the supervisor, Ms. Ancell. *Id.* Therefore, it must have been Ms. Ancell who gave Ms.

Humphrey the password to log into Mr. Tate's and Mr. McCain's case files.   *Id.*

     **Conclusion**: Ms. Ancell and Ms. Humphrey acted in concert to spy on Mr. Tate and Mr.

McCain by computer, not to help them with their caseloads.   They attempted to spy

systematically and in secret, not realizing that Ms. Humphrey's identifier would appear on screen.

     **2.** Mr. Tate presented evidence that Ms. Humphrey's spying did in fact lead directly to a

disciplinary action against him and Mr. McCain, in which they were both charged with

"nepotism".   This charge was based upon a document in the case file of one of the Anna clients.

     This client needed a wheelchair ramp built onto his house.   Standard procedure was for

him to get three estimates and submit them to DRS for approval.   Tate Aff ¶¶(160-71); McCain

Aff ¶¶(63-75).   Unbeknownst to McCain, the client had obtained a bid from McCain's brother,

who is a contractor.   *Id.*   Of course, Mr. McCain and Mr. Tate refused to consider this bid, due to

nepotism, so it was not processed any further.   *Id.*   But it was in the case file.

One day Ms. Humphrey came unexpectedly to the Anna office, and rummaged through this client's case file.   *Id.*   When she found what she was looking for, she grabbed a hard copy of the case file to take back with her to the Carbondale office.   *Id.*

State rules prohibit state employees, or persons who contract with the state from engaging in nepotism.   Tate Aff ¶¶(136-7); Green Aff ¶¶(124-5).   If Mr. McCain, or even Mr. Tate, had actually hired McCain's brother to do this installation, then they would have been in violation.

Apparently that is just what Ms. Ancell hoped for.   She called the Assistant Bureau Chief (who supervises all of the DRS offices in Southern Illinois), Ron Sazone, and asked him to come down to the Anna office. She then presented this "evidence" and (triumphantly) charged Mr. Tate and Mr. McCain with nepotism. McCain Aff ¶¶(75-6,79); Tate Aff ¶¶(172-80); Green ¶¶(103-20).

But the document was only a request by the client, not an approved order.   Neither Mr. Tate nor Mr. McCain solicited or authorized it.   *Id.*   To prove this, Mr. Tate obtained documentation directly from the central office in Springfield (by fax) that same day, showing that they had never awarded Mr. McCain's brother any contracts for any client.   *Id.*   As a result, Mr. Sazone dismissed the charges on the spot, that same day.   *Id.*

**Conclusion**: Ms. Humphrey's acts of spying led directly to at least one false disciplinary charge – for nepotism – being issued against Mr. Tate and Mr. McCain.

**3.** Nevertheless, Ms. Evans, the regional director for Addus, fired Mr. McCain the very next day after this incident.   McCain Aff ¶¶(2, 85); Plaintiff's Ex. 7(b) (filed as a supplement to Ex. 7). She wrote Mr. McCain a brief letter of explanation, giving the principal reason as nepotism:

> In May of 05, staff was instructed that they could not and would not be allowed to service family members or use family members for contractual work.   It has been the findings of the site director [Ancell] that Robert [McCain] has not complied with this policy.   Ex. 7b.

This letter was dated after Mr. Sazone (Ms. Ancell's supervisor) found that Mr. McCain

had not committed nepotism.   Therefore the charge was groundless at the time.

It is true that this letter listed other reasons in addition to nepotism. *Id.* But the other reasons were vague and inconclusive, and rather unconvincing after eight years of good service by Mr. McCain.   McCain Aff. ¶¶ 2-6, 19-20.   One can reasonably infer that the real "reason" for firing Mr. McCain was nepotism.   But this is odd coming from the same two women (Ancell and Evans) who arranged for both Ms. Evans' sister and her daughter to be hired by DRS. Ancell Dep. at 101; Tate Aff ¶(183).   One can infer that their professed concern about nepotism was a pretext.

**Conclusion**: Ms. Ancell and Ms. Evans acted in concert to have Mr. McCain fired, using as pretext a "nepotism" charge that Ms. Ancell knew to be false at the time, and that Ms. Evans either knew or should have known was false (if she had reviewed the facts).   They attempted to establish misconduct for Mr. Tate as well.   But unlike Mr. McCain, Mr. Tate is a state employee, entitled to due process. Tate, Aff. ¶¶(10-12, 38-44, 114-5);   McCain Aff ¶(5); Tuttle Aff ¶¶(73-78); Risse Aff ¶¶(57-8); Ancell Dep at 64. That is why Ms. Ancell called in her supervisor (Sazone) to try to discipline Mr. Tate, but Mr. Sazone overruled her.

**4.** The firing of Mr. McCain constituted a substantial step (though not the only one) in isolating Mr. Tate and setting him up for further job actions.   Mr. McCain was a Case Manager ("CM") hired through Addus.   He and Mr. Tate had worked closely together at DRS for eight years.   He performed essentially the same tasks as Mr. Tate – assessing clients to determine their needs, then ordering the appropriate assistance for them.   McCain Aff. ¶(19-20, 48-53); Tate Aff. ¶ (36, 119-121, 125, 181).   Together, the two of them assessed and evaluated all of the clients in the region served by the Anna office. *Id.* This region was divided into two districts. *Id.* Mr. Tate took one district; Mr. McCain the other. *Id.* There were no backlogs or other apparent problems with the cases in either district. *Id.*

Furthermore, Mr. McCain actively assisted Mr. Tate in attempting to protect Mr. Tate's secretary from the sexual predations of their former supervisor, Mr. Farmer.   Together they coordinated their schedules (with the permission of the Assistant Bureau Chief at the time, Mr. Jimenez) so that one of them would be in the office with Ms. Green at all times.   Tate Aff. ¶(16, 24-37, 45-51, 58); McCain ¶(2-3, 7-9, 23-31); Jimenez Aff ¶(5-11, 18-9).

Ms. Ancell told Mr. McCain the very first time she met him, as the new supervisor for the Anna office: "I have a mind to have you fired." McCain ¶¶(45-6).   No reason was given at the time, or even later during deposition testimony.   Ancell Dep. at 19.

**Conclusion**: The firing of Mr. McCain by Addus was designed in part to isolate Mr. Tate, thereby making him more vulnerable to misconduct charges; and in part to retaliate against all persons who had assisted Mr. Tate in opposing Mr. Farmer's acts of sexual harassment.

**5.** Mr. McCain was replaced as Mr. Tate's Case Manager ("CM") by Sandy Kohler, Ms. Evans' sister.   Ancell Dep. at 101; Tate Aff. ¶ 135.   Furthermore, it appears that the firing of Mr. McCain was planned, even before the nepotism incident.   That is because Ms. Kohler was hired to be a Case Manager in Anna one month before McCain was fired (as if she were being trained first). This was inexplicable to Mr. Tate, who had no need of another CM at the time.   Jordan Aff ¶¶(34-6); Tate Aff. ¶¶(125,132-140); McCain Aff.   ¶¶(53,90-93); Green Aff. ¶¶(121-132).

Mr. Tate believes and infers that Ms. Kohler was put in that position to work with Ms. Humphrey and Ms. Ancell in spying on him directly from the Anna office.

In further support of that belief, Mr. Tate presented testimony from a client, Jerry Casper, that Ms. Kohler came to his home one year for his annual reassessment, in place of Mr. Tate. Casper Aff. ¶¶(2-27).   Instead of just asking Mr. Casper about his current health and current needs, Ms. Kohler began asking him odd questions about how Mr. Tate had performed during the previous year's assessment.   *Id*. These were not just polite customer service questions.   For

instance, Ms. Kohler asked Mr. Casper if Mr. Tate had talked to him the previous year about the

fact that his wife had just died, or if he seemed tired or nodded off during the reassessment.   *Id.*

One can reasonably infer that Ms. Kohler was probing for a way to charge Mr. Tate with

misconduct.   And, if she did so with Mr. Casper, she undoubtedly did so with other clients as well.

Mr. Casper told Ms. Kohler that Mr. Tate had behaved very professionally during the

previous year's reassessment.   *Id.*   Nevertheless, the day after this interview, an investigator

from Springfield called him to discuss Mr. Tate's performance at the previous year's assessment.

*Id.* Presumably, it was not Ms. Kohler who notified Springfield. She was just an Addus employee.

One can infer that Ms. Kohler reported to Ms. Ancell, who notified Springfield to follow-up.

**Conclusion**: Ms. Evans' sister, Ms. Kohler, replaced Mr. McCain in the Anna office of

DRS.   She cooperated with Ms. Ancell in spying on Mr. Tate and attempting to dig up dirt on him

for the purpose of filing misconduct charges against him.   In light of the fact that two key Addus

employees, Humphrey and Kohler, both acted to trump-up phony misconduct charges against Mr.

Tate, at the behest of Ms. Ancell, one can infer that all of the misconduct charges against Mr. Tate,

as filed by Ms. Ancell are suspect, and likely tainted with false testimony by employees of Addus.

**6.** Even before Mr. McCain was fired, Mr. Tate's long-time Office Support Person

("OSP") (*i.e.* assistant secretary) Mary Sadler was fired.   The idea of firing Ms. Sadler was first

raised with DRS higher management by Mr. Farmer, the former supervisor who sexually harassed

Mr. Tate's secretary (Ms. Green).   Ms. Sadler had worked at DRS for nine years without problem.

Sadler Aff. ¶¶(2-8); Ex. 3. But Mr. Farmer wrote to Mr. Standerfer, the Bureau Chief for the entire

southern half of the State, that Sadler "must go."   Ex. 3.

It should be noted that Ms. Sadler, herself, had accused Mr. Farmer of sexual harassment at

a time before he became supervisor and began harassing Ms. Green.   Sadler Aff. ¶¶ 10-26.   In his

e-mail to Mr. Standerfer, Mr. Farmer did not raise any complaint about Sadler's work performance (assisting Mr. Tate).   Instead, he described her as a "pathological liar" (*i.e.* she had previously filed a complaint against Farmer for sexual harassment), "who keeps stirring anything negative that she can" (*i.e.* she supported Ms. Green in her complaint against Farmer).   Ex. 3.

But it fell to Ms. Evans and Ms. Ancell to fire Ms. Sadler.   They did so on trumped up charges.   Indeed, the discharge letter written by Ms. Evans echoes the e-mail (Ex. 3) from Mr. Farmer to Mr. Standerfer.   It states that Ms. Sadler was fired due to six reasons:

> (1) Failure to work effectively w/n the team; (2) failure to understand the role of office support personnel; (3) made disparaging remarks about staff; (4) made accusatory statements that were false; (5) not following chain of command; (6) creates controversy amongst the staff.

Sadler Aff ¶(10-26, 95); Ex. 6.

The only person Ms. Sadler ever made accusatory statements against is Mr. Farmer. Sadler Aff ¶¶(62-4,96-9); Tate Aff ¶¶(129-30).   Yet, that is why Ms. Evans fired her.

Furthermore, Ms. Evans obviously did not even believe these charges herself. The same day that she fired Ms. Sadler from DRS, Ms. Evans offered her a job at Addus.   SadlerAff. ¶ 100.

**Conclusion:** Ms. Sadler was fired for pretextual reasons, despite years of effective service, in order to further isolate Mr. Tate, and to carry out a plan to retaliate against the persons who had assisted Mr. Tate's secretary in opposing sexual harassment.

**7.**   Gayle Johnson avers that she applied through Addus for a job as OSP for DRS. She further avers that Ms. Ancell offered her the job as OSP in Anna, *provided that* she (Johnson) would agree to spy on Mr. Tate for Ms. Ancell.   She turned it down.   Johnson Aff. ¶¶(65-75).

Ms. Johnson was a retired DRS employee who had previously worked at DRS for 27 years. Johnson Aff. ¶ 2.   She did not consider this to be a normal request. Johnson Aff. ¶¶(65-75).

**Conclusion:** Ms. Ancell and Ms. Evans collaborated in an attempt to hire an OSP to

replace Ms. Sadler, who would agree to spy on Mr. Tate for Ms. Ancell.

**8.** Suzie Jordan joined the Anna HSP staff as an OSP in place of Sadler.   She attests that Ancell groomed her and cultivated her.   Jordan Aff. ¶¶(1-10).   But when Ancell asked her to spy on Tate, she would not do it.   To the contrary, she began to help Tate, getting materials ready for his clients and so forth.   She was supposed to be "office support", but when Ms. Ancell found out, she fired Ms. Jordan.   Ms. Ancell bluntly gave as her reason that Ms. Jordan *wrongfully* assisted Mr. Tate.   Jordan Aff. ¶¶(11-22); Tate Aff. ¶(131).   That is the whole reason her job existed.

**Conclusion:** One can infer that Ms. Ancell was actively seeking to isolate Mr. Tate: (a) by having the OSP spy on Mr. Tate; and (b) by trying to bar the OSP from actually helping Mr. Tate, per their job description.   Ms. Jordan was fired because she would not do either of these things.

**9**. Kim Evans' daughter, Casey Evans, was hired to fill the OSP position formerly held by Ms. Sadler and then Ms. Jordan.

**Conclusion:** One can infer that Ms. Ancell and Kim Evans had a *quid-pro-quo,* in which Ms. Evans was able to arrange for jobs for her sister and daughter (in violation of State nepotism rules (Tate Aff ¶¶ 136-7)), and in return she agreed to allow Addus employees to be used as agents of Ms. Ancell in attempting to find dirt on Mr. Tate and set him up for misconduct charges.

**10.**   Ms. Humphrey's ex-husband and her son both averred that Ms. Humphrey told them about Tate: "He's not going to be around much longer.   *We*'re making sure of that."   Then she said: "He's done some bad things and he's going to pay for it.   He's not going to be employed there much longer."   T. Hammond ¶¶(1-10); J. Hammond ¶¶(1-10).   (Emphasis added.).   One can infer that Ms. Humphrey, as a mere Addus contract worker, was privy to and a willing participant in Ms. Ancell's scheme to fire Mr. Tate (via progressive discipline).

**Conclusion:** Even though she was merely an Addus employee, Ms. Humphrey saw herself

as an active participant in and part of Ms. Ancell's plans to fire Mr. Tate.   In light of #11 below,

wherein Ms. Humphrey actively participated in setting Mr. Tate up for a suspension, one can infer

that the method of firing Mr. Tate was intended to be progressive discipline.

**11.** In one well-documented instance, Ms. Ancell and Ms. Humphrey set a trap for Mr.

Tate.   First, Ms. Ancell gave Mr. Tate directives: (a) to "confer" with Humphrey on a particular

Summary of Evidence ("SoE"); and then (b) to present the SoE to Ms. Ancell for her review by

November 20, 2006.   Tate Aff. ¶¶(335-8); Ex. 24 (directive).   (An SoE is the name for the "brief"

prepared by DRS for an administrative appeal, when a client is denied continuation of services.)

Mr. Tate had never before been instructed to work with Ms. Humphrey on an SoE, and it

was totally unnecessary in this case, because the client had literally defaulted.   A brief SoE

outlining the default would have sufficed.   Nevertheless, in good faith, on Thursday, November

16, Mr. Tate scheduled with Humphrey to meet with her on the morning of November 20 (even

though this was a vacation day for him).   Tate Aff. ¶¶(339-350, 357); Ex. 21 (calendar).

On November 17, Ms. Humphrey e-mailed Mr. Tate that she could not make it.   However,

Mr. Tate did not see this because he was already on vacation on the 17th, as Ms. Ancell well knew,

since she must approve vacation time in advance.   Ex. 22 (vacation schedule).   In Ancell's

disciplinary action, she disingenuously stated that Ms. Humphrey came to Anna on the 17th, but

Mr. Tate refused to meet with her.   But he "refused" because he was not there.   He was on

vacation.   Mr. Tate then showed up on the morning 20th, as agreed, even though this was also a

vacation day for him, but Ms. Humphrey did not show.   Tate Aff. ¶¶(339-378).

This put Mr. Tate in a bind.   If he waited for a new date to meet with Ms. Humphrey, he

would violate Ancell's directive to complete the SoE on the 20th.   If he completed it on the 20th, he

would violate the directive to "confer" with Ms. Humphrey *before* completing it.

Tate completed the SoE.   *Id*.   Ancell approved it, just as Tate had written it.   *Id*.   DRS

then won the appeal.   *Id*.   Consequently, there was no harm to DRS.

Nevertheless, Mr. Tate was charged with insubordination, and suspended.   *Id.*

Humphrey was not disciplined at all.   *Id.*

**Conclusion:** Ms. Ancell and Ms. Humphrey conspired to entrap Mr. Tate in a situation

where no matter what he did, he would violate one of Ms. Ancell's directives.   The hearing in

which he was found "guilty" of this non-existent misconduct was a sham hearing.

**12.** Mr. Tate has sleep apnea.   He had a long-standing accommodation, worked out with a

previous Supervisor, Ms. Young, to cope with his tendency to fall asleep at afternoon meetings by

having a member of his support staff sit next to him and just poke him if he started to nod off.

When he lost his loyal support staff, there was no one to do this for him anymore.   He did, in fact,

fall asleep at a meeting.   Ms. Ancell then charged him with misconduct and suspended him for 15

days.   Young Aff. ¶¶(21-27); Tate Aff. ¶¶(400-405); Ex. 20.

**Conclusion:** Ms. Ancell's scheme with Ms. Evans to isolate Mr. Tate in the workplace by

stripping him of loyal support staff contributed directly to this misconduct charge and suspension.

**13**.   The hiring of Ms. Evans sister and daughter at DRS constituted nepotism.   The

nepotism law covers not just State employees but contractors, such as Addus, who work with the

State.   Tate Aff. ¶¶ 136-7.

**Conclusion:** The nepotism charge against Mr. Tate and Mr. McCain was a pretext, not

only because it was factually false, but because Ms. Ancell and Ms. Evan were not truly concerned

with nepotism.   This formed part of a pattern of sham disciplinary actions against Mr. Tate.

**14.**   The hiring of Ms. Evans' sister and daughter at DRS clearly benefited the Addus

Regional Director Ms. Evans, in that she was able to obtain a job for her sister and daughter.

**Conclusion:** One can reasonably infer a *quid-pro-quo* between Ms. Evans and Ms. Ancell.

Ms. Ancell did something illegal in hiring Ms. Evans' sister and daughter, despite nepotism rules.

Ms. Evans did something illegal in helping Ms. Ancell violate Mr. Tate's civil rights.

**15**.   Mr. Tate averred that Ms. Humphrey and Ms. Kohler were given flagging rights. This was highly unethical to give to an Addus employee.   Tate Aff. ¶¶ 184-198.   This is because Addus does not merely provide an employment service to DRS; it also provides home care for DRS clients.   *Id.*   By giving flagging rights to Ms. Humphrey and Ms. Kohler, Ms. Ancell gave them the right to assign Addus home care providers to each of their clients at the State's expense. *Id*.   Mr. Tate attests to having examined the records and discovered that Ms. Kohler was assigning an abnormal number of Addus home care providers to her clients in Anna. Tate Aff. ¶¶ 201-208.

**Conclusion:** Addus profited as a business from the *quid-pro-quo* between Ms. Ancell and Ms. Evans.   Hence, Addus profited as a business from the conspiracy to retaliate and discriminate against Mr. Tate.

### III. CONCLUSION

The Plaintiff has presented an abundance of concrete evidence in support of the factual allegations he made in his Complaint.   In light of this evidence, it is unreasonable for the Court to hold that his Complaint was groundless.

**WHEREFORE,** and for all the reasons above, the Plaintiff respectfully requests that this Court reverse its decision and deny the award of attorney's fees to the Addus Group of Defendants.

Respectfully Submitted,

s/Richard Fedder
Attorney for Plaintiff

Richard Fedder
ARDC#6272204
144 Pineview Rd.
Carbondale, IL 62901
Telephone: (618) 201-5834

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2011, I electronically filed the above Motion for

Reconsideration of the Award of Attorney's Fees to the Addus Defendants with the Clerk of the

Court using the CM/ECF system which will send notification of such filing(s) to the following:

Carmen N. Couden
Bernard Bobber
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, Wi. 53202-5306
414-271-2400
414-297-4900 (fax)
ccouden@foley.com
bbobber@foley.com


Kelly Choate
Assistant Attorney General
Office of the Attorney General
500 South Second Street
Springfield, Illinois   62706
217-782-1090
217-782-7046 (fax)
kchoate@atg.state.il.us


Joanna Belle Gunderson
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
217-782-1841
217-524-5091 (fax)
jgunderson@atg.state.il.us

Respectfully Submitted,
s/Richard Fedder